Argued and submitted July 19, 1982, resubmitted in banc February 9, reversed and remanded for trial February 16, reconsideration denied May 6, petition for review denied July 19, 1983 (295 Or 446)

STATE OF OREGON,
*Appellant,*

*v.*

EUGENE CAMPOS GLADE,
*Respondent.*

(10-80-08390; CA A22927)

659 P2d 406

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Robert J. McCrea, Eugene, argued the cause for respondent. With him on the brief was Morrow, McCrea & Divita, P.C., Eugene.

ROSSMAN, J.

Buttler, J., concurring in part; dissenting in part.

## ROSSMAN, J.

The state appeals from a pretrial order suppressing evidence seized during a series of warrantless searches. ORS 138.060(3). We reverse and remand for trial.

## FACTS

On September 2, 1980, at approximately 2 p.m., a man and a woman approached Fejer, an air freight agent for United Airlines in Los Angeles, to deliver a wrapped package to be sent to Eugene by air freight. They told Fejer that the package contained baby clothes. He informed the couple that they could save about $30 by sending the package through the post office across the street. The couple, however, insisted on shipping the package by air freight, explaining that the clothes needed to arrive before the birth of a baby. They left it with Fejer and then made a telephone call from a booth.

Based on the couple's apparent anxiety about the exact time the package would arrive in Eugene, their insistence on sending the package by air freight and their telephoning someone immediately after they left the package, Fejer contacted his supervisor, Allen, and conveyed his suspicions that the package might contain illegal cargo.[1] Allen took the package to his office where, pursuant to federal tariff regulations,[2] he opened one end of the package and discovered a blue sweater. When he removed and unfolded it, he found a pillowcase in which there was a clear plastic zip-lock baggie containing white powder. He opened the baggie, smelled the contents and then closed it. On the basis of his training in narcotics as a reserve police officer for the Los Angeles police department,[3] he suspected that the baggie contained illegal cargo, possibly narcotics.

---

[1] Specifically, Fejer testified that he thought the package might contain combustible liquid.

[2] Civil Aeronautics Board Tariff 331, Rule 24, permits airline inspection undertaken at the initiative of airline employes.

[3] Allen testified that he has been a reserve police officer for the city of Los Angeles since 1976, and has received instructions in recognizing persons suspected of trafficking in narcotics and that the information relayed to him by Fejer fitted the drug courier profile. The trial court found that the police search was separate from the carrier's search and that Allen was not acting as an instrument or agent of the Los Angeles police department when he opened the package.

He then contacted the airport station of the Los Angeles police department and spoke to Detective Kaiser, a narcotics agent. He told Kaiser what he had found and what he suspected.

Kaiser went to Allen's office at approximately 2:15 p.m. He observed the unwrapped package, sweater, pillowcase and plastic baggie lying on top of Allen's desk. He testified that when he first observed the white powder he thought that its appearance was consistent with that of cocaine, but he conceded that its appearance was also consistent with a number of other substances, including baby powder. Kaiser opened the baggie, smelled its contents and noted a smell consistent with cocaine. By performing a field test, he confirmed that the substance was cocaine and then took the baggie, the other contents of the package and the wrappings to his office at the airport. Although it was a weekday and magistrates were available in the airport area, he made no attempt to obtain a search warrant.

In his office, Kaiser weighed the baggie and then telephoned the United States Drug Enforcement Agency in Eugene. He spoke to special agent Wisenor, advised him of the discovery of the cocaine and suggested that the package be rewrapped and shipped according to schedule to Eugene. Wisenor agreed. Kaiser then described the package to Wisenor and informed him of the airline flight number, its departure time and that the package would arrive in Eugene at approximately 8 p.m. After retaining a portion of the cocaine to be used in prosecution of the shippers, Kaiser repacked and resealed the package and placed it aboard the aircraft before his scheduled departure.

Wisenor met the plane in Eugene at 8 p.m., claimed the package after identifying it and took it to Tindall, an investigator for the Lane County District Attorney's office who was posing as a United Airlines ticket agent. When the package was not claimed within 45 minutes, Tindall telephoned the consignee and explained that the package had arrived at the terminal. Approximately an hour later, defendant and a companion arrived, claimed the package and left. Outside the terminal, defendant was arrested. The package was taken from defendant, and he

was escorted to the police department office in the terminal. He was then informed of his *Miranda* rights.[4] He was questioned and made some incriminating statements. He also opened the package, although the trial court found that he had done so involuntarily.

Defendant moved to suppress all evidence obtained from the search and seizure of the package, as well as statements made by him following his arrest in Eugene. At the close of the suppression hearing, the court made the following written findings in its order:

"1. An inspection of Defendant's property occurred at the Los Angeles airport at Los Angeles, California by agents of the United Airline Freight Division and the same was without governmental involvement;

"2. Such agents contacted the Narcotics Division of the Los Angeles police department and displayed to a detective who came to the United agents' office, a transparent 'zip-locked' plastic 'baggie' of white powder, and it was described as coming from within a pillowcase wrapped in a sweater in a paper wrapped package delivered for shipment, by individuals in Los Angeles, to Eugene, Oregon;

"3. Probable cause existed for the detective to go further at that point;

"4. Facilities were available enabling the detective to obtain a search warrant from a magistrate to proceed further and no warrant was obtained;

"5. No exigent circumstances existed necessitating further police search or seizure without a warrant;

"6. The Los Angeles police detective conducted an unlawful search and seizure of the 'baggie' and the powder contained therein;

"7. All subsequent police action was derivative from such unlawful search and seizure and the Defendant's Motion to Suppress should therefore be allowed;

"8. The court does not find further unlawful police activity, absent its being derivative from the original

---

[4] Defendant testified that he was not informed of his *Miranda* rights until after the interrogation and the opening of the package. The trial court specifically stated in its oral findings that defendant was advised of his *Miranda* rights prior to the opening of the package and interrogation of defendant. The written findings did not cover the point.

unlawful police search and seizure, but does make the following special findings:

"a. The State has failed to prove by clear and convincing evidence that the Defendant's validly consented to open the sealed package while in the police office at the Eugene, Oregon airport, but that the package there was so opened;

"b. No exigent circumstances existed justifying the opening of the package at the time, place or in the manner it was so opened."

The court suppressed all physical evidence seized and statements made following the seizure of the package in Los Angeles.[5] On appeal, the state contends that, notwithstanding the invalidity of the "consent" search of the package in Eugene, the evidence obtained up to that event is admissible. We agree.

## Examination and Testing of the Package's Contents in Los Angeles

■■■ The Fourth Amendment protects not only people and places, but their "effects" as well. The unauthorized opening of a sealed package constitutes an unreasonable invasion of an owner's constitutionally protected interest in privacy. *See Walter v. United States,* 447 US 649, 654, 100 S Ct 2395, 65 L Ed 2d 410 (1980). However, a search by a private party acting on his own volition does not involve the Fourth Amendment. *Walter v. United States, supra,* 447 US at 656; *Burdeau v. McDowell,* 256 US 465, 41 S Ct 574, 65 L Ed 1048 (1921); *State v. Boutin,* 26 Or App 485, 552 P2d 1349, *rev den* (1976). Here, the initial search of the wrapped package and its contents in Los Angeles was undertaken by the air freight agents on their own initiative and without instigation or assistance by the government and was, therefore, a private search. *See United States v. Kelly,* 529 F2d 1365, 1371 (8th Cir 1976); *United States v.*

---

[5] In defendant's motion to suppress, he requested that all evidence obtained from the search and seizure of defendant's property and the arrest, detention and interrogation of defendant be suppressed. Thus, despite the trial court's oral finding that statements made by defendant after he was advised of his *Miranda* rights were admissible, the written order allowed defendant's motion to suppress in its entirety including statements he made following his arrest.

*Pryba,* 502 F2d 391 (D.C. Cir 1974), *cert den* 419 US 1127 (1975). Kaiser did not initiate or participate in Allen's search of the package and discovery of its contents; therefore, the question is whether Kaiser's subsequent examination and testing of the powder Allen found were such an extension of the private search that his actions constituted a separate search implicating the Fourth Amendment. *See Walter v. Unites States, supra; United States v. Haes,* 551 F2d 767, 771 (8th Cir 1977).

On similar facts, the Court of Appeals for the Sixth Circuit in *United States v. Barry,* 673 F2d 912, *cert den* 459 US 927 (1982), and the New York Court of Appeals in *People v. Adler,* 50 NY2d 730, 431 NYS2d 412, 409 NE2d 888, *cert den* 449 US 1014 (1980), upheld the warrantless examination and sampling by police of suspected illegal drugs discovered during private searches. In *Barry,* the defendant was arrested after he had claimed a package at the Memphis office of Federal Express, a private freight carrier. The package had arrived the day before at the carrier's airport office in damaged condition and was referred to an employe, who ordinarily would have taken such a package to a "re-wrap area." However, through a hole in the package the employe saw four bottles containing pills and, suspecting that the pills were contraband, he called a security manager, who opened the package. Inside were bottles marked "Methaqualone."[6] In response to the manager's call, the Drug Enforcement Agency sent two agents, who examined the package and its contents and took five pills for testing. The tests were positive. The agents then resealed the package and returned it to Federal Express.

The court found that, although no warrant authorized the DEA agents' seizure and testing of the pills and no exigent circumstances excused the failure to procure a warrant, the defendant's Fourth Amendment rights were not violated. The court rejected the defendant's

---

[6] Although Methaqualone may be possessed legally, the manager's suspicions were raised by the large quantity of pills and the fact that the pharmaceutical numbers had been effaced.

argument that, under *Walter v. United States, supra,*[7] and *Arkansas v. Sanders,* 442 US 753, 99 S Ct 2586, 61 L Ed 2d 235 (1979), the testing of the pills was a separate search and a further invasion of privacy requiring a warrant.

"We find both of these cases distinguishable. *Walter* turned on the fact that the material seized was protected by the First Amendment. The chemical testing of Barry's pills was simply not an investigation on the scale required in *Walter* to adjudge the obscenity of the films. It was at

---

[7] In *Walter v. United States,* 447 US 649, 100 S Ct 2395, 65 L Ed 2d 410 (1980), an interstate shipment of sealed packages was misdelivered to a party other than the consignee. Employes of that party opened the packages and found individual film boxes with labels bearing explicit descriptions and suggestive drawings of homosexual activities. After attempting *unsuccessfully* to view the film by holding it up to the light, the employes contacted FBI agents, who took the packages and, without obtaining a warrant, viewed the films on a projector and determined that they were obscene. A majority of the court held that the officers did not have authority to *project* the films without a warrant. Two members of the majority, Stevens and Stewart, JJ, distinguished an officer's authority to possess a package from his authority to examine its contents. They concluded that the officer could examine the contents of the packages "to the extent that they had already been examined by third parties," 447 US at 656, but that the screening "was a significant expansion of the search that had been conducted previously by a private party" and as such constituted a "separate search." 447 US at 657. In answer to the government's contention that petitioners' expectation of privacy in the films was lost by the private search, Stevens, J., stated:

"* * * The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the *additional search* conducted by the FBI — the screening of the films — was not supported by any justification, it violated that Amendment." *Walter v. United States, supra,* 447 US at 659. (Footnotes omitted; emphasis supplied.)

White, J., joined by Brennan, J., concurred in the judgment, but stated that "[t]he notion that private searches insulate from Fourth Amendment scrutiny subsequent governmental searches of the same or lesser scope is inconsistent with traditional Fourth Amendment principles." 447 US at 660. Thus,

"* * * if the private parties * * * had projected the films before turning them over to the Government, the Government still would have been required to obtain a warrant for its subsequent screening of them. * * * [T]he Government's subsequent screening of the films constituted an independent, governmental search that would have infringed petitioners' Fourth screening by private parties." 447 US at 662.

Unlike the circumstances here, *Walter* involved films which are protected by the First Amendment and that amendment in conjunction with the Fourth Amendment imposes greater strictures on the government. The Supreme Court did not explicitly base its holding on the fact that First Amendment materials enjoy greater protection; however, that concept is mentioned in the body of the opinion and in footnotes. *See e.g. Walter v. United States, supra,* 447 US at 655 n 6.

most routine. For the same reason *Sanders* is not applicable. When the suitcase was seized, the officers could not tell by its appearance alone that it contained contraband. Discovering the concealed marijuana required a search separable from the seizure of the suitcase. The same cannot be said of the perfunctory test conducted here by DEA." *United States v. Barry, supra,* 673 F2d at 920.

In *Adler,* the defendant was arrested in New York after picking up a package shipped to her by air from Los Angeles. The package had been delivered to United Airlines in Los Angeles by an individual who claimed it contained a vase. The individual "appeared nervous," and an airline employe, becoming suspicious, first x-rayed and then opened the package. Inside was a large quantity of pills. The employe then informed a Los Angeles police officer of his discovery. The officer took custody of the package and had the pills analyzed, which test disclosed the presence of amphetamines and barbiturates. After concluding that the examination by the airline employe was a private search, the court analyzed the Fourth Amendment considerations as follows:

"* * * Here, the existence of illicit drugs had been discovered in the course of a private search; any invasion of defendant's privacy interests was complete at that point. No new or different search was effected by the immediate surrender to and inspection by the police officer. [Citations omitted.] Indeed, *the Fourth Amendment simply was not implicated by the voluntary transfer of the package to the police, for no governmental seizure in the constitutional sense exists in such a situation.* [Citations omitted.] *The police did not go beyond the private search when they examined the contents of the package* (cf. *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 [Stevens and Stewart, JJ.]). *It is thus immaterial whether the airline agent knew or reasonably suspected the illicit nature of the package's contents, or whether the package remained open when the police arrived in response to the agent's call* (see *United States v. Blanton,* 479 F.2d 327, 327-328, *supra* [airline employees suspected but were not sure that the object found in an attache case was a silencer for a firearm]). This case does not involve a closed container in the constitutional sense, for the container in which the drugs were found had been opened and examined by the airline agent. *The police intruded upon no privacy*

*interest not already invaded by the private party and thus lawfully seized the evidence proffered."* 431 NYS2d at 415-16. (Emphasis supplied; footnote omitted.)

■ ■ We conclude that the principles expressed in *Barry* and *Adler* are applicable to Kaiser's examination and testing of the powder following the private search. First, Allen's voluntary transfer of possession of the plastic baggie and its contents to Kaiser following that search did not implicate the Fourth Amendment. *See United States v. Sherwin,* 539 F2d 1, 7-8 (9th Cir 1976), *cert den* 437 US 909 (1978). Second, during the private search, Allen (1) opened the package, (2) removed the clear plastic baggie from inside the pillowcase, (3) opened the baggie and (4) smelled the contents, which, on the basis of his training, he suspected to be an illegal drug. Under these circumstances, any violation of defendant's privacy interests was complete at that point, and Kaiser's examination did not constitute a significant expansion of that initial inspection. We reject the notion that there is a legitimate privacy interest in the chemical composition of a substance lawfully possessed by the police. That would be taking the Fourth Amendment too far. The test results should not have been suppressed.[8]

## The Arrest of Defendant and Seizure and Search of the Package in Eugene

■ ■ The trial court found, and defendant concedes, that the Los Angeles officer, after observing the plastic baggie, had probable cause to believe that it contained cocaine. The analysis of the baggie's contents strengthened the probable

---

[8] As the court in *People v. Adler,* 50 NY2d 730, 431 NYS2d 412, 416 n 4, 409 NE2d 888, *cert den* 449 US 1014 (1980), explained:

"That the drugs were subjected to laboratory analysis does not alter the nature of the seizure. The drugs, the nature of which was reasonably self-evident, were already lawfully in the possession of the police. Unless we are prepared to hold that there is a reasonable and justifiable expectation of privacy in the contents of a pill capsule, it cannot be said that an intrusion into privacy interests was effected by scientifically examining the drugs. Indeed, to read *Walter* to require a warrant at this point would result in a mandate that the police obtain a warrant whenever legally seized drugs are to be subjected to analysis. We do not read *Walter,* involving as it did First Amendment considerations and a general exploratory viewing of films contained within separate sealed boxes, as compelling that result."

cause he already had. When Kaiser called the Eugene authorities to explain that a package containing what he knew to be cocaine would be arriving in Eugene later that night, he supplied them with probable cause to arrest defendant and to seize the package from him when he claimed it at the terminal. The Eugene police, having probable cause, were not required to obtain a warrant for defendant's arrest. *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976).

■ The subsequent search of the package and seizure of the evidence it contained were also valid. The control over the package and its contents exercised by law enforcement officials after the initial discovery of the cocaine was effectively unbroken; neither the transfer from one law enforcement agency to another, nor relinquishing possession to the airline for the flight from Los Angeles to Eugene rendered the control and surveillance of the package discontinuous. Under these circumstances, the search and seizure of the package and its contents did not constitute an independent intrusion under the Fourth Amendment but was, instead, a continuation of the valid acquisition and inspection effected earlier in Los Angeles. *See United States v. Andrews,* 618 F2d 646 (10th Cir 1980), *cert den* 455 US 919 (1982); *United States v. Ford,* 525 F2d 1308 (10th Cir 1975); *United States v. DeBerry,* 487 F2d 448 (2d Cir 1973); *McConnell v. State,* 595 P2d 147 (Alaska), *cert den sub nom McConnell v. Alaska,* 444 US 918 (1979). The physical evidence taken from the package in Eugene should not have been suppressed.

■ The trial court also suppressed the statements made by defendant after his arrest on the ground that they were tainted by the search and seizure of the baggie and powder in Los Angeles. Because we conclude that the earlier search was valid, it follows that the suppression of defendant's statements was error.

Reversed and remanded for trial.

**BUTTLER, J.,** concurring in part; dissenting in part.

Whether we approve of them or not, we are bound by decisions of the United States Supreme Court on federal

constitutional questions. Yet the majority essentially ignore *Walter v. United States,* 447 US 649, 100 S Ct 2395, 65 L Ed 2d 410 (1980), under which the chemical analysis undertaken by the Los Angeles police officer would be impermissible without a warrant. Instead, the majority rely on a state court decision and a lower federal court decision.

In *Walter,* an interstate shipment of sealed packages was misdelivered to a party other than the consignee. Employes of that party opened the packages and found individual film boxes with labels bearing explicit descriptions and suggestive drawings of homosexual activities. After attempting unsuccessfully to view the film by holding it up to the light, the employes contacted FBI agents, who took the packages to their office. Without obtaining a warrant, the agents viewed the films on a projector and determined that they were obscene.

A majority of the court held that the officers did not have authority to project the films without a warrant. Three members of the majority, Stevens, Stewart and Marshall, JJ, distinguished an officer's authority to possess a package from his authority to examine its contents. They concluded that the officer could examine the contents of the packages "to the extent that they had already been examined by third parties." Because the private parties had not projected the film, the FBI agents could search no further without obtaining a search warrant. Moreover, in answer to the government's contention that petitioners' expectation of privacy in the films had already been lost by the private search, Stevens, J., stated:

> "* * * The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI — the screening of the films — was not supported by any justification, it violated that Amendment." *Walter v. United States, supra,* 447 US at 659. (Footnotes omitted.)

White, J., joined by Brennan, J., concurred in the judgment, but stated that "[t]he notion that private

searches insulate from Fourth Amendment scrutiny subsequent governmental searches of the same or lesser scope is inconsistent with traditional Fourth Amendment principles." *Walter v. United States, supra,* 447 US at 660. Thus,

> "* * * if the private parties * * * had projected the films before turning them over to the Government, the Government still would have been required to obtain a warrant for its subsequent screening of them [because] * * * the Government's subsequent screening of the films constituted an independent, governmental search that would have infringed petitioners' Fourth Amendment interests without regard to any previous screening by private parties." 447 US at 662.

Here, as in *Walter,* the initial invasion of defendant's privacy occurred when private parties opened the package. In *Walter,* the private parties removed the film and attempted to determine whether it portrayed the homosexual acts depicted by words and drawings on each container; here, the private parties opened the plastic bag and smelled the contents to attempt to confirm their suspicions. In *Walter,* the police went further by projecting the films to verify that they portrayed obscene conduct; here, the police went further by conducting a chemical analysis of the contents of the baggie to verify its contents. *Walter* held that the additional search by the police without a warrant violated defendant's Fourth Amendment rights.

Unless there is a valid distinction between *Walter* and this case, the chemical analysis performed by the Los Angeles police is not admissible here. The majority have not attempted to make a distinction. Instead, they rely on *United States v. Barry,* 673 F2d 912 (6th Cir 1982), and *People v. Adler,* 50 NY2d 730, 431 NYS2d 412, 409 NE2d 888, *cert den* 449 US 1014 (1980), each of which purported to distinguish *Walter* on the grounds that the films in *Walter* were protected by the First Amendment and that a chemical test is not as significant an investigation as is the viewing of film.

I do not accept that analysis; neither did the court in *United States v. Jacobsen,* 683 F2d 296 (8th Cir

1982). There, the court concluded that *Walter* required suppression of the result of chemical analysis made by federal agents under facts substantially identical to those presented here. White powder had been found by Federal Express employes when a box delivered to the carrier for shipment broke open. The employes removed the plastic bags from the box, but did not remove any of the powder or analyze it before putting the bags back in the box. They suspected the powder was a controlled substance and notified the Drug Enforcement Agency. The DEA agents removed the bags, took samples and subjected them to tests in order to determine their composition. The court said:

> "The DEA agents' extension of the private search precisely parallels that in *Walter*. In both cases, viewing the objects with unaided vision produced only an inference of criminal activity. In both cases, government agents went beyond the scope of the private search by using mechanical or chemical means to discover the hidden nature of the objects. The governmental activity represents a significant extension of the private searches because it revealed the content of the films in *Walter* and, here, the composition of the powder. In the absence of exigent circumstances, which the government does not allege, we hold the agents were required to obtain a warrant authorizing the taking of samples and analysis thereof." 683 F2d at 299-300. (Footnote omitted.)

One may disagree with *Walter* or speculate whether the United States Supreme Court will follow it in the future, but to attempt to distinguish it on the ground that it was a First Amendment case is nonsense. The requirement for a warrant is no greater when the object of the search may be protected by the First Amendment than when it is not, although it may be more difficult to articulate probable cause to support a warrant to search for obscene materials. We are bound by the court's application of the Fourth Amendment in *Walter,* under which the warrantless testing of the contents of the plastic baggie by the Los Angeles officer constituted an unreasonable search, and evidence of the test results was properly suppressed.

However, it does not follow that all of the evidence need be suppressed. The trial court found, and defendant concedes, that the Los Angeles officer, after observing the plastic baggie, had probable cause to believe that it

contained cocaine and could have obtained a warrant to search (*i.e.,* analyze) its contents. Given that premise, the analysis of the baggie's contents did no more than strengthen the probable cause he already had. When Detective Kaiser called the Eugene authorities to explain that a package containing what he believed to be cocaine would be arriving in Eugene later that night, he supplied them with probable cause to arrest defendant and to seize the package from him when he claimed it at the terminal. The Eugene police, having probable cause, were not required to obtain a warrant for defendant's arrest. *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976). When they arrested defendant after he claimed the package, they were also entitled to seize the package then in his possession as incident to a lawful arrest. *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973); *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969); *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974). I agree that the statements made by defendant following his arrest and *Miranda* warnings were admissible.

The more troublesome question, however, is whether the search of the package following its seizure from defendant in Eugene was lawful. Even though the trial court found (and the state concedes) that defendant's consent to the opening of the package was involuntary, if the police could have lawfully opened and searched the package seized incident to defendant's arrest, defendant's consent would be irrelevant. The majority hold that the police had control over the package during the entire time from its acquisition in Los Angeles up to defendant's arrest. Whether that proposition is valid may be questionable, but, in any event, the Eugene police had authority to seize the package incident to the valid custodial arrest of defendant. Under *Walter v. United States, supra,* the police had authority to go as far as the private parties had gone in Los Angeles, so I do not think that we are faced with the problem of whether this case is controlled by the line of cases represented by *State v. Brown,* 291 Or 642, 634 P2d 212 (1981); *United States v. Robinson, supra; Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973); and *United States v. Edwards,* 415 US 800, 94 S Ct 1234, 39 L Ed 2d 771 (1974), sustaining warrantless searches of

containers taken from persons incident to custodial arrest, or whether it is controlled by such authority as *United States v. Chadwick,* 433 US 1, 97 S Ct 2476, 53 L Ed 2d 538 (1977), and *Arkansas v. Sanders,* 442 US 753, 99 S Ct 2586, 61 L Ed 2d 235 (1979).[1]

To summarize, I agree that the trial court erred in suppressing all of the evidence. In my opinion, the only evidence that must be suppressed is the chemical analysis made in Los Angeles of the contents of the plastic baggie.

Warren and Newman, JJ, join in this concurring and dissenting opinion.

---

[1] The distinction seems to be that it is permissible to open small closed containers taken from an arrestee's clothing, but not larger closed containers seized at the time of the arrest, from a place other than the arrestee's clothing. In the latter setting,

"* * * [o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *United States v. Chadwick, supra,* 433 US at 15.