Argued and submitted January 2, reversed and remanded June 25,
petition for review allowed October 15, 2008 (345 Or 381)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN FREDERICK LUMAN,
*Defendant-Appellant.*

Linn County Circuit Court
04102244; A132197

188 P3d 372

Chris W. Dunfield argued the cause and filed the brief for appellant.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendant was convicted on 11 counts of invasion of personal privacy, ORS 163.700,[1] and argues on appeal that the trial court erred in denying in part his motion to suppress evidence found on a videotape. As explained below, we conclude that the videotape should have been suppressed. Accordingly, we reverse and remand.

The facts pertinent to the issue presented on appeal are, for the most part, not in dispute, as the parties stipulated to most of the facts at the suppression hearing. On August 23, 2004, one of the employees at defendant's restaurant and catering business, Smith, turned on the television in the kitchen to watch the news, although defendant had instructed the employees not to use the television.[2] When Smith turned on the television, a video in an attached video recorder began playing. Smith observed that the video appeared to show women using the toilet in the restaurant's restroom. He alerted another employee, Jones, who also observed portions of the videotape. Smith and Jones investigated the restroom and located wires running from the video recorder to the restroom, as well as an area where they

---

[1] ORS 163.700 provides, in part:

"(1) Except as provided in ORS 163.702 [pertaining to medical and law enforcement exceptions], a person commits the crime of invasion of personal privacy if:

"(a)(A) The person knowingly makes or records a photograph, motion picture, videotape or other visual recording of another person in a state of nudity without the consent of the person being recorded; and

"(B) At the time the visual recording is made or recorded the person being recorded is in a place and circumstances where the person has a reasonable expectation of personal privacy[.]"

[2] The state appears to take issue with that factual conclusion on appeal. However, the trial court made a specific determination that defendant "had instructed Smith and Jones they were not to use the TV." The trial court's factual findings are binding on appeal as long as there is evidence to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The parties stipulated during the suppression hearing to certain facts, including that "if called, [defendant] would testify without objection that the television was for [his] sole use. Employees were not permitted to use the television on the job." Thus, to the extent that the state makes arguments on appeal that defendant had no privacy interest—or some sort of reduced privacy interest—in the videotape in the video recorder because he did not adequately communicate to his employees not to use the television, we find that argument to be foreclosed by the trial court's explicit factual finding, which is supported by the stipulation.

believed the camera could have been placed. They also located several additional videotapes in the kitchen, as well as a large number of videotapes in a bag inside a walk-in cooler. Two of the videotapes, including the one that Smith and Jones watched, were labeled "master." Some of the other tapes had handwritten labels with names of movies on them. Jones turned all of the videotapes over to the Linn County Sheriff's Office.

Four days later, and without first obtaining a warrant, Deputy Harmon viewed the videotapes. Most of them were recordings of the restroom that contained considerable footage of times when the restroom was not in use. The videotapes did, however, also contain numerous images of people using the toilet in the restroom. The camera had been positioned in such a way as to show female patrons using the toilet in a state of partial nudity. The two tapes labeled "master" contained the same images but had been edited. In total, the tapes contained footage of 48 people using the restroom.[3]

Defendant was charged with 48 counts of invasion of personal privacy. He moved to suppress the videotapes and all evidence derived from the videotapes on the ground that Harmon's viewing of the tapes without first obtaining a warrant was an unconstitutional search of the videotapes in violation of defendant's rights under Article I, section 9, of the Oregon Constitution, as well as the Fourth Amendment to the United States Constitution. The state responded that no warrant was required for Harmon to view the videotapes because the sheriff's office had received the videotapes from an employee who described the contents of one of the tapes— and, consequently, the tapes "announced their contents" as containing evidence of the crime of invasion of personal privacy.

---

[3] No evidence was presented as to which of the two tapes labeled "master" was the one that the employees viewed in part. However, the two "master" tapes contained the same 11 images, with the only difference being that one of them also contained additional images. The trial court concluded that it would not suppress the "master" tape with 11 images. In his second assignment of error, defendant challenges whether the state laid an adequate foundation for the admission of that tape into evidence. Because of our resolution of the suppression issue, we need not reach that question.

The trial court addressed the motion to suppress in a comprehensive and thoughtful letter opinion.[4] Ultimately, the court concluded that, *with the exception of the "master" videotape that defendant's employees had viewed before calling the police,* Harmon's viewing of the tapes violated defendant's rights under Article I, section 9. The trial court first rejected the state's contention that the videotapes "announced their contents":

> "I am convinced by this argument that the police had probable cause to obtain a warrant, but it does not convince me that the tapes 'announced' their contents. When I think of evidence 'announcing' its contents, I think of the 'suggestive drawings' and the 'explicit descriptions of the contents' as found on the videotapes in *Walter* [*v. United States,* 447 US 653, 100 S Ct 2395, 65 L Ed 2d 410 (1980)]. Here, most of the tapes simply had homemade stickers with the names of commercial movies written on them while two of them were labeled 'Master.' This by no means 'announced' that they contained the offensive material that was actually contained on the videos. Indeed, if 'possession of evidence coupled with probable cause to believe inspection would produce evidence of a crime' was the same as evidence 'announcing its contents' the need for the majority of search warrants would be unnecessary."

The court concluded, however, that a different analysis controlled with respect to the "master" tape viewed by the employees:

> "Here, one video had been viewed (at least partially) by Defendant's employees, but none of the other tapes had been viewed. The contents of none of the tapes, including the one viewed by the employees, were in 'plain view' as the cocaine was in [*State v. Glade,* 61 Or App 723, 659 P2d 406, *rev den,* 295 Or 446 (1983)]. But still, at least the contents of the 'master' tape had become 'apparent' by the time the police examined it and under [*State v. Munro,* 194 Or App 538, 546, 96 P3d 348 (2004), *rev'd on other grounds,* 339 Or 545, 124 P3d 1221 (2005)], the police invaded no privacy interest of Defendant which had not already been invaded. The same cannot be said for the videotapes in the cooler or

---

[4] Although the Honorable Glen Baisinger presided at trial, the Honorable Rick McCormick ruled on the pretrial motion to suppress.

the other videotapes in the kitchen. The police may have had probable cause to believe that these other tapes contained incriminating material but their contents had not become apparent and Defendant's privacy interest still trumped any warrantless search (minus other exceptions such as exigent circumstances—which do not exist in this case). Under Article I, section 9, the master tape is not suppressed. All others are."

Thus, the court's disposition as to the "master" tape rested on the premise that, because the contents of that tape had become apparent (because of the employees' statements to the police) by the time Harmon examined it, "the police invaded no privacy interest of Defendant which had not already been invaded"—and that conclusion, in turn, flowed from the trial court's understanding and application of our decision in *Munro*.[5]

In light of the trial court's ruling, the state proceeded on 11 counts of invasion of personal privacy, as substantiated by the content of the "master" videotape. The jury found defendant guilty on all counts.

On appeal, defendant argues that, under Article I, section 9, or the Fourth Amendment, the trial court erred in denying in part his motion to suppress. He also advances assignments of error pertaining to the foundational admissibility of the "master" videotape, as well as a challenge to the imposition of consecutive sentences. For the reasons that follow, we conclude that the trial court erred, under Article I, section 9, in denying defendant's motion to suppress. Consequently, we reverse and remand.[6]

We note, at the outset, that the question presented here pertains solely to the lawfulness of the purported search, and not of any seizure. That is, defendant does not assert that the police obtained the videotapes unlawfully. Further, the state does not assert that the videotapes were abandoned property in which defendant could assert no

---

[5] The trial court also rejected defendant's arguments under the Fourth Amendment.

[6] Given our analysis and disposition, we need not address defendant's arguments under the Fourth Amendment and do not reach his second and third assignments of error.

interest. Thus, the issue is simply whether, by viewing the videotapes without first obtaining a warrant, Harmon unlawfully "searched" the videotapes, in violation of defendant's rights under Article I, section 9. *See generally State v. Heckathorne*, 218 Or App 283, 287, 179 P3d 693 (2008) (Article I, section 9, protects both possessory and privacy interests).

■      Article I, section 9, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." A search conducted without a warrant is deemed *per se* unreasonable unless it falls within an exception to the warrant requirement. Here, no warrant was obtained for the viewing of the videotapes, and the state has identified no applicable exception to the warrant requirement. Thus, the only argument available to the state in seeking to justify the warrantless viewing of the videotapes was that the viewing did not constitute a "search" within the meaning of Article I, section 9. *See State v. Howard/Dawson*, 342 Or 635, 640, 157 P3d 1189 (2007) (when police act without a warrant and no exception to the warrant requirement applies, "the question whether the police have violated Article I, section 9, reduces to whether the officers' acts invaded either a constitutionally protected possessory or privacy interest").

■      Before proceeding to the core of the parties' dispute on appeal—*viz.*, *Munro*'s proper application to these circumstances—we confirm the trial court's determination that none of the videotapes, including the "master" tape viewed by defendant's employees, "announced its contents." In *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986), the court summarized the controlling principles:

> "Some containers, those that by their very nature announce their contents (such as by touch or smell) do not support a cognizable privacy interest under Article I, section 9. Transparent containers (such as clear plastic baggies or pill bottles) announce their contents. The contents of transparent containers are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container. Applying the doctrine of 'plain view' to transparent containers, we hold that no cognizable privacy interest inheres in their contents, and thus that

transparent containers can be opened and their contents seized. No warrant is required for the opening and seizure of the contents of transparent containers or containers that otherwise announce their contents."

*See generally Heckathorne*, 218 Or App at 288-90 (addressing distinction between whether a container "announces its contents" and whether police had probable cause to believe a container holds contraband).[7] Consistently with those principles, we have held that an unlabeled videotape does not announce its contents. *Munro*, 194 Or App at 546.

Before the trial court, however, the state contended that the "master" videotape viewed by defendant's employees "announced its contents" because the employees who had viewed it "announced" to the police what it contained. As the trial court understood, however, that rationale cannot be squared with the above-quoted language from *Owens*, which limits the "announce its contents" doctrine to containers that "by their very nature" so disclose their contents as to effectively render those contents in "plain view." 302 Or App at 206. A person announcing to the police what he or she believes is inside a closed container is not in any way equivalent to a transparent container announcing its own contents, or the contents being in plain view. Indeed, if that were true, a locked safe would "announce its contents" if a person who had seen the contents of the safe before it was closed subsequently disclosed that information to the police.

■ In sum, properly understood, the question here is not whether the videotape "announced its contents." Rather, it is whether the fact that defendant's employees had viewed a portion of the tape before turning it over to the police somehow eliminated defendant's constitutionally protected privacy interest in its contents. The parties' dispute in that regard centers on *Munro*.[8] Accordingly, we describe that case in some detail.

---

[7] *See also State v. Fugate*, 210 Or App 8, 14, 150 P3d 409 (2006) (addressing same distinction); *State v. Stock*, 209 Or App 7, 11-12, 11 n 1, 146 P3d 393 (2006) (same).

[8] The state also refers, in passing, to *State v. Glade*, 61 Or App 723, 659 P2d 406, *rev den*, 295 Or 446 (1983). That case, however, was decided solely under the Fourth Amendment and sheds no light on how the issue should be analyzed under the Oregon Constitution—and, in fact, contains numerous statements that are at odds with the Oregon Supreme Court's Article I, section 9, analysis in *Owens*.

In *Munro*, the police obtained a warrant to search the defendant's house for drug-related evidence. The warrant specifically authorized the seizure of videotapes and the search of any such tapes for evidence relating to drug transactions. 339 Or at 548-49 n 4. Pursuant to that warrant, the police seized a videotape that, when initially viewed, appeared to be blank. The videotape remained in the possession of the police while a prosecution of the defendant on drug-related charges was underway. *Id.* at 549. A year after the initial seizure of the videotape pursuant to the warrant, the police (who had, in the interim, received information that the videotape contained child pornography) were able, with the help of a video service company, to view the images on the videotape and determine that it did, in fact, contain child pornography. *Id.*

Thereafter, the defendant was charged with encouraging child sex abuse. The defendant moved to suppress the contents of the video, arguing that the warrant did not authorize the subsequent viewing of the tape under those circumstances. *Id.* at 547. The trial court denied the motion to suppress, and the defendant was convicted of encouraging sexual abuse. *Id.*

The Supreme Court affirmed. The state, while conceding on appeal that the "videotape did not announce its contents" and that the viewing constituted a "search," maintained that the search was authorized by the warrant. *Id.* at 550. The Supreme Court agreed:

> "We agree with defendant that an unlabeled videotape is not a transparent container that announces its contents to anyone looking at the container. As the owner of the videotape, defendant had a possessory and a privacy interest in the contents of the videotape[.]"

*Id.* at 551-52. The court went on to hold, however, that "the warrant authorized the police to invade the privacy of the videotape by *examining and exhibiting its contents.*" *Id.* at 552 (emphasis added). In so holding, the Supreme Court explained:

> "Once the police seized the videotape under the authority of the warrant, any privacy interest that defendant had in the contents of the videotape was destroyed by the authority of

the warrant permitting the examination and exhibition of the contents of the videotape. Until such time as defendant regained lawful possession of the videotape, he had no remaining privacy interest in its contents that he could assert."

*Id.*

Here, the state invokes the language quoted immediately above as validating Harmon's warrantless viewing of the contents of the "master" videotape. Specifically, the state asserts that, "just as the seizure of the videotape in *Munro* 'destroyed' the defendant's privacy interest in the video and its contents, so did the employees' viewing of the 'master' videotape and their act of turning it over to the police destroy defendant's privacy interest" here.

We disagree. The Supreme Court in *Munro* did *not* hold that the defendant's privacy interest in the contents of the videotape was destroyed merely by virtue of the lawful *seizure* of the videotape pursuant to the warrant. Rather, the defendant's privacy interest was "destroyed by the authority of the warrant *permitting the examination and exhibition of the contents of the videotape.*" 339 Or at 552 (emphasis added). That is, the dispositive circumstance in *Munro* was that "*the warrant authorized the police to invade the privacy of the videotape.*" *Id.* (emphasis added).

■    This case is not analogous. Obviously, and decisively, there was no warrant here that authorized "the examination and exhibition of the contents of the videotape." *Id.* Further, the mere fact that a private third party has knowledge of the contents of something in which a defendant claims a privacy interest—even if that party conveys the information to the police—does not mean that a defendant no longer has "the right to be free from intrusive forms of government scrutiny." *State v. Dixson / Digby*, 307 Or 195, 208, 766 P2d 1015 (1988). Article I, section 9, does not countenance such a result.

■■    Seeking to skirt that constitutional cul-de-sac, the state raises a related argument that defendant's placement of the videotape in a location where his employees could view

it (should they disobey his instructions not to use the television) meant that defendant did not "have much, if any, privacy interest in the video." We disagree. To be sure, a person can essentially relinquish or lose any right to privacy by revealing conduct or items in such a way as to make the conduct or items generally observable or accessible by the public at large. *See, e.g., State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983) (an individual can abandon his right to privacy by engaging in conduct "in otherwise protected areas in such a way that [his] * * * acts can plainly be seen or heard outside without any special effort"). Here, however, a "special effort" was required in order for anyone to view the contents of the video. The video could not be viewed without turning on the television in the restaurant kitchen, which defendant had explicitly directed his employees not to use. Thus, the contents of the videotape here were not freely observable or accessible but, instead, were observed only because the employees violated an explicit work-related directive by defendant, their employer.

*State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993), is instructive by way of comparison. In *Wacker*, police used enhanced technology to observe a defendant using cocaine in a car that had its interior lights on and was parked in a tavern parking lot through which tavern patrons were passing. Under those circumstances, the court concluded:

> "No privacy interests of defendant were invaded here and, thus, there was no search while the car was parked in the tavern's parking lot. The open-to-the-public nature of defendant's and Weare's location and activities in a lighted car in a tavern parking lot during business hours establishes that no government conduct significantly impaired defendant's privacy."

*Id.* at 427. Here, by contrast, the videotape in question was located inside a video recorder attached to a television in the portion of defendant's business that was not open to the public. Moreover, defendant had instructed his employees who were authorized to be in that location not to use the television, which was the means that the employees used to view the videotape. Although it is true that defendant certainly could have taken *additional* steps to protect his privacy interest in the contents of the videotape, it cannot be said, under

these circumstances, that he had effectively abdicated any privacy interest in the contents of the videotape.

In sum, we agree with defendant that the "master" videotape was, in fact, a closed container that did not announce its contents and in which defendant retained a privacy interest when it was in the lawful possession of the police. Consequently, Harmon's viewing of the tape constituted a warrantless search, to which no exception to the warrant requirement applied.[9] The trial court erred in declining to suppress the contents of that videotape.

Reversed and remanded.

---

[9] For example, the state does not contend that any exigent circumstances justified Harmon's warrantless viewing of the videotape. Thus, even assuming, without deciding, that the police had probable cause to believe that the videotape contained evidence of a crime, they were constitutionally required to obtain a search warrant before viewing the tape's contents.