Argued and submitted January 30, reversed and remanded October 21, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN GEORGE STOKKE,
*Defendant-Appellant.*

Washington County Circuit Court
C053646CR; A134852

220 P3d 59

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was

Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.*

ARMSTRONG, P. J.

---

* Brewer, C. J., *vice* Wollheim, J.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for seven counts of identity theft, ORS 165.800, and one count of unlawful possession of a controlled substance, methamphetamine, *former* ORS 475.992(4)(b) (2003), *renumbered* as ORS 475.840(3)(b). He assigns error to the trial court's denial of his motion to suppress evidence that was found in a safe belonging to him that he had left in a hotel room past checkout time. The safe was opened by hotel employees in the presence of a police officer; a different officer removed and seized items from the open safe without a warrant after hotel employees told him that the safe contained identification documents (IDs), checkbooks belonging to other people, drugs, a scale, and sexually explicit material. On appeal, we conclude that the court erred in denying defendant's motion to suppress, and, therefore, reverse and remand.

When we review a trial court's decision on a suppression motion, we are bound by the trial court's findings of historical fact if there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). However, we review the trial court's conclusions for legal error. *Id.*

Defendant was a guest at the Red Roof Inn in Tualatin. When defendant did not check out of his room by the designated checkout time, hotel employees entered the room to evict him. One of the employees, Forbes, testified that, when he entered the room, he did not find defendant, but he saw "stuff everywhere," including clothes, a locked safe underneath a bedside table, a laptop, drug paraphernalia, two buckets with tools and keys, and papers with different people's names on them. The employees removed the items from the room and put them in a holding area in the hotel lobby behind the front desk. The employees called the police because the property in the room seemed "suspicious" to them, "like things were stolen," and their supervisor had told them that, under those circumstances, they should call the police. After a police officer arrived, one of the employees opened the safe to inventory its contents, using a key that he had found in the room. Forbes testified that he saw IDs, drugs, a scale, and some sexually explicit material inside the safe.

The first police officer had to leave the hotel at that point because of a shift change, and Officer Louka arrived at the hotel 10 to 15 minutes later. With respect to the first officer's conduct during the hotel employees' search of the safe, the trial court noted that

> "there's no testimony in the record as to whether or not [Mr. Forbes] was directed to open the safe [by the first officer].
>
> "However, it appeared from Mr. Forbes' testimony that he was opening the safe in an attempt to inventory the contents since they were—the hotel itself was taking possession of it, and he looked through and told us specifically what was in the safe before Officer Louka ever came on the scene, that there were [IDs], there were drugs, the scale, the pornography. That was all from Mr. Forbes' testimony, apparently from his inventory before [Officer Louka] arrived."

Louka testified that, when he arrived, Forbes told him that he had found IDs, drugs, a scale, sexually explicit material, and "a bunch of checkbooks belonging to several different people" in the safe. Forbes also gave Louka pictures that Forbes had taken of the contents of the room and the safe. The hotel employees had left the safe open, and Louka could see that the safe contained checkbooks, but he could not see the names on the checkbooks. Based on the information from Forbes and the photographs, Louka testified that he "had a good idea" what the safe contained, and he reached into the safe and removed the items. Louka did not apply for a warrant before removing the contents of the safe. He also did not testify that he seized any of the items in the safe before removing them to examine them.

At trial, defendant moved under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution to suppress the evidence found in the safe as the product of an unlawful search. The court denied defendant's motion on the basis that the evidence was in plain view, and, thus, the police had not conducted a search before seizing the evidence. Defendant proceeded with a stipulated facts trial, which led to the convictions from which he appeals.

■ On appeal, defendant assigns error to the trial court's denial of his motion to suppress the evidence seized by Louka from the safe. Defendant advances three arguments in support of his claim of error, but, because it is dispositive, we address only one of them. Specifically, defendant argues that the court erred in denying his suppression motion because Louka conducted an unlawful search when he removed and inspected the contents of the safe, in violation of Article I, section 9, and the Fourth Amendment. Because we agree with defendant that Louka conducted an unlawful search in violation of Article I, section 9, and reverse on that ground, we do not reach defendant's Fourth Amendment argument.

■ Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure[.]" A search conducted without a warrant is unreasonable *per se*, unless it falls within one of the few "specifically established and well-delineated exceptions" to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983).

The state contends that, when Louka reached into the safe, removed the checkbooks and the methamphetamine, and examined the names on the checkbooks, Louka did not conduct a search, because the hotel employees had already examined those items, and Louka's inspection of them did not exceed the scope of the employees' inspection. The state's theory is that a police search that follows a private search does not violate Article I, section 9, so long as the police search does not reveal any information beyond that which was revealed by the private search.

In support of its argument, the state cites *State v. Britten*, 89 Or App 374, 379, 749 P2d 1193, *rev den*, 306 Or 78 (1988).[1] In *Britten*, the defendant's landlord entered a cabin

---

[1] The state also cites for support *United States v. Jacobsen*, 466 US 109, 104 S Ct 1652, 80 L Ed 2d 85 (1984). In that case, the United States Supreme Court held that a law enforcement officer did not conduct a search in violation of the Fourth Amendment when the officer opened a package that had previously been opened and inspected by Federal Express employees. The Court reasoned that the initial search of the package was the result of private action, and, because the additional invasion by the officers did not exceed the scope of the private search, the officer's conduct did not violate the Fourth Amendment. *Id.* at 118-22. Although

rented by the defendant to pack up the defendant's belongings after he had been arrested and had failed to pay his rent. While doing so, the landlord discovered a box containing photographs of naked women and girls and a ledger that the landlord believed chronicled the defendant's sexual encounters with numerous women and girls. The landlord contacted the sheriff's office, and, when an officer arrived, the officer and the landlord together "thoroughly searched the cabin and [the] defendant's effects and found more pictures, some of which showed [the] defendant engaged in sexual acts." *Id.* at 377. The trial court suppressed the evidence found in the search, and we affirmed. *Id.* at 379-80.

The state contends that *Britten* supports its argument that a search by a police officer does not violate Article I, section 9, if it follows a private search and does not exceed the scope of the private search. In *Britten*, we noted that the landlord "notified the police of the suspicious evidence and [the officer], on his arrival, participated in *and extended the scope of the search* and then seized the evidence." *Id.* at 379 (emphasis added). In the state's view, the emphasized language was critical to our decision. It was not. As we explained,

> "Here, [the officer] was more than an observer. He participated in a search, which 'occurs when a person's privacy interests are invaded.' *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). [The d]efendant's privacy interest in his effects is specifically protected by Article I, section 9, *State v. Tanner*[, 304 Or 312, 745 P2d 757 (1987)], and [the officer] violated that protected interest *by searching through [the] defendant's effects and then seizing them*, all without a warrant or any exception to the warrant requirement."

*Britten*, 89 Or App at 379 (emphasis added). Thus, the determinative factor in *Britten* was *not* that the officer had extended the scope of the private search, but, rather, that the officer had conducted a search of the defendant's effects without a warrant or an exception to the warrant requirement.

---

*Jacobsen* may stand for the proposition that a search by a police officer that follows a private search and does not extend the scope of the private search is not an unlawful search under the Fourth Amendment, we are not persuaded that *Jacobsen* has any bearing on the proper understanding of Article I, section 9.

Additionally, in *State v. Luman*, 220 Or App 617, 188 P3d 372, *rev allowed*, 345 Or 381 (2008), we squarely addressed the question whether an officer's search of property is lawful if it follows a private search and does not extend beyond the initial private search. In that case, the defendant owned a restaurant and catering business. One of his employees turned on a television in the restaurant's kitchen even though he had been told not to use it, and, when he did so, a video recording began to play that appeared to show women using the toilet in the restaurant's restroom. The defendant's employees then discovered wires running from the video recorder to the restroom, and they also discovered additional videotapes. The employees turned the tapes over to the police, describing what they had discovered, and an officer viewed the tapes without a warrant. The state argued that the conduct of the police officer in viewing the videotapes without a warrant did not constitute a search that violated the defendant's privacy interest, because the viewing of the tapes by the defendant's employees had destroyed the defendant's privacy interest in the tapes. We rejected that argument, explaining that

> "the mere fact that a private third party has knowledge of the contents of something in which a defendant claims a privacy interest—even if that party conveys the information to the police—does not mean that a defendant no longer has 'the right to be free from intrusive forms of government scrutiny.'"

*Id.* at 626 (quoting *State v. Dixson/Digby*, 307 Or 195, 208, 766 P2d 1015 (1988)).

This case is analogous to *Britten* and *Luman*. In both of those cases, we rejected the argument that a search by a private actor somehow renders a subsequent police search—which, under Article I, section 9, requires a valid warrant or an exception to the warrant requirement—not a search, for constitutional purposes.

The private search by the hotel employees does not bear on whether the state needed a warrant or an exception to the warrant requirement to conduct a search of defendant's possessions. When Louka moved and examined the

contents of the safe without a warrant, he conducted a warrantless search in violation of Article I, section 9. Accordingly, the evidence obtained from the safe must be suppressed.

■    The state contends, however, that the methamphetamine found in the safe should not be suppressed, because Louka saw the methamphetamine before searching the safe, and, hence, his seizure of it was lawful because it was contraband in plain view. *See, e.g., State v. Guggenmos*, 225 Or App 641, 648-49, 202 P3d 892 (2009), *rev allowed*, 347 Or 258 (2009) (upholding trial court's denial of the defendant's motion to suppress methamphetamine seized under plain view). The trial court found that Louka saw the drugs in plain view:

> "So at the point that Officer Louka comes on the scene, he's been notified that these items have been left in the room and have been moved by the employees. He sees a safe that's standing open, and to the officer, he sees at least some indication of someone's checkbook in plain view, and the methamphetamine, as I recall, the officer thought was in plain view * * *."

As previously stated, in reviewing a trial court's suppression decision, we are bound by the court's findings *if* there is evidence in the record to support them. *Ehly*, 317 Or at 66. Here, Louka did not testify that he could see the methamphetamine before removing the items from the safe. Accordingly, because the trial court's finding that Louka saw methamphetamine in the safe before he removed items from the safe is not supported by the record, we are not bound by that finding.[2] Because there is no basis in this record on which to find that Louka saw the methamphetamine before he removed items from the safe in which the methamphetamine was located, it follows that the methamphetamine must also be suppressed as evidence obtained from an unlawful search.

Reversed and remanded.

---

[2] In other words, there is no basis in the record on which to find that Louka saw the methamphetamine before he conducted a search by moving and examining items from the safe or that he seized any items from the safe and thereby made it possible to see the methamphetamine before he moved items in the safe in the course of searching through them.