# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3478

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD S. CONNORS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 326—**Ronald A. Guzmán**, *Judge.*

ARGUED OCTOBER 27, 2005—DECIDED MARCH 21, 2006

Before EASTERBROOK, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Divorce rates are disturbingly high. Sometimes, marital splits get nasty when an ex-spouse decides to dish out a little dose of discomfort to his or her former partner. And as far as dishing out discomfort is concerned, the havoc visited on Chicago lawyer Richard Connors by his ex-wife would win a gold medal for creativity. With substantial assistance from his ex, Connors stands convicted in federal court of (among other things) violating a law we seldom encounter, the Trading with the Enemy Act (TWEA), 50 U.S.C. App. §§ 5(b)(1) and 16. Today, we resolve Connors's appeal from that conviction.

After an 11-day jury trial, Connors was found guilty of smuggling Cuban cigars into the United States in violation of 18 U.S.C. § 545; one count of conspiracy, 18 U.S.C. § 371; one count of making a false statement on a passport application, 18 U.S.C. § 1542; and violating the TWEA.[1] He was sentenced to a 37-month prison term.

At the trial, the government's star witness was Special Agent John Sheridan of the U.S. Customs Service. Sheridan spent more than 3 years investigating Connors's activities. Only after the trial did Connors learn that Agent Sheridan had an inside source of information— Connors's ex-wife, Nicole Chakalis. Connors now argues that Chakalis's involvement in the investigation violated the Fourth Amendment and that the prosecution's failure to disclose the details of her activities before trial deprived him of due process under *Brady v. Maryland*, 373 U.S. 83 (1963).

Sheridan began his investigation in early 1996 after Chakalis contacted him about one of her ex-husband's upcoming trips to Cuba. (Her motives are not entirely clear—she says she was concerned because Connors was planning on taking their son with him and getting him in trouble, but there also appears to have been an element of spite involved.) Thanks to the information Chakalis provided, Connors was stopped at the Canadian border on his way back to the United States, and a trunkload of Cuban cigars (46 boxes in 4 suitcases— evidence suggests that they could be sold for something in the area of $350 per box) was seized along with Connors's passport (for which he soon obtained a replacement—more on that later). Over the next 3 years, Chakalis continued to

---

[1] Cuba, since shortly after Fidel Castro's assumption of power in 1959, has been one of the major targets of the 1917 Act which, as applicable to this case, imposes an embargo on bringing Cuban products into the United States.

provide Sheridan with information about Connors's travels, dealings, and associates—information she was able to obtain by renewing her relationship with Connors and spending weekends at his house.

Chakalis's information, and other evidence gathered in the investigation, disclosed that Connors ran a fairly lucrative Cuban cigar smuggling operation. Traveling from places like Toronto and Cancun, he made some 31 trips to Cuba between 1996 and 1999. And Cuban cigars have a definite cachet:[2] Despite some controversy over the degree to which Cuba (where tobacco was first encountered by European explorers) has been able to maintain the quality of its cigars under communist rule, it is undisputed that the leaves grown in the fertile soil of the Vuelta Abajo, in the western province of Pinar del Río, cultivated and prepared according to centuries-old traditions, produce an incomparably smooth, pungent, and full-bodied smoke. *See* James Suckling, "On the Road to Tobacco Country: A journey into the Vuelta Abajo, land of the world's best cigar leaves," *Cigar Aficionado* magazine, May/June 2001.

Connors was unaware of his ex-wife's cooperation until after the trial when, apparently remorseful, she told him what she had done. At a post-trial hearing, she testified that Sheridan not only asked her to cozy up to Connors but also suggested that she obtain incriminating documents from his house and place them in the trash for Sheridan to retrieve. Connors argues that this amounted to an illegal search under the Fourth Amendment, with Chakalis, in effect, acting as Sheridan's agent. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971); *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997). But Sheridan,

---

[2] Actually, all cigars do; as Rudyard Kipling noted in *The Betrothed*, "[A] woman is only a woman, but a good cigar is a Smoke."

although acknowledging that he recovered a number of pieces of evidence from Connors's garbage, denied urging Chakalis to put the pieces there for him to find.

The district court found no Fourth-Amendment violation. For one thing, the court was uncertain that the activities Chakalis described even amounted to an illegal search, given that Connors himself welcomed her into his home. More important, the court didn't believe that things unfolded the way Chakalis described. The court found particularly suspicious the documentation Chakalis produced to corroborate her story—a printout of a computerized journal recounting her dealings with Sheridan, including his suggestion that she convey documents to him through the trash. Chakalis claimed that the printout reflected the journal in its original form without any later editing, but the court found numerous entries that referred to events after the dates on which they were supposedly written. Also, when testifying about the journal at the hearing, Chakalis could not recall basic facts about it, such as the name of the computer file in which it was kept. Finding the journal an unreliable source of corroboration, the court credited Agent Sheridan's testimony that he was neither involved in nor aware of any illegal search that Chakalis may have undertaken.

Connors renews his argument that Chakalis's participation in Sheridan's investigation violated the Fourth Amendment and that all of the evidence recovered as a result of her participation should have been suppressed. The fact that Chakalis was spying on Connors and exploiting his misplaced trust in her does not by itself amount to a constitutional violation, even if it was at the behest of the government. *See Hoffa v. United States*, 385 U.S. 293, 302 (1966). When a friend is false, blame the friend, not the government. Rummaging through Connors's private files for incriminating documents, however, may be another matter, *see id.* at 301, but only if Sheridan directed or acquiesced in

it, *see Shahid*, 117 F.3d at 325. The district court concluded that Sheridan did not know of any illegal rummaging and that Chakalis's contrary testimony was not credible; the question for us is whether that was a reasonable conclusion. Connors argues that it wasn't. He suggests that Sheridan must have realized Connors was too cautious to throw away incriminating documents and therefore must have known the items he found in the trash were put there by Chakalis. Maybe Sheridan could have drawn that inference, but criminal investigators are not required to assume that their targets always act prudently. The only evidence that Sheridan knew of Connors's cautiousness comes from Chakalis's journal, in which she reports telling Sheridan that Connors "never throws anything out." But the district court found, as we said, the contents of that journal to be unreliable, and Connors has given us no reason to reject that finding.

Connors also argues that the government violated his right to due process by withholding any inkling about Chakalis's involvement in the investigation. In general, however, the government is not required to reveal the identity of nontestifying confidential informants unless the information is relevant and helpful to the defense. *See Rovario v. United States*, 353 U.S. 53, 59-62 (1957); *United States v. Banks*, 405 F.3d 559, 564 (7th Cir. 2005). Connors doesn't argue that knowing the informant's identity would have helped his defense, but rather that there was other material in Sheridan's confidential informant file that would have allowed him to impeach Sheridan's trial testimony. Specifically, the file shows that Chakalis at one point told Sheridan that Connors was able to devote himself to his cigar-related activities because of a large settlement he had won several years earlier in a personal-injury lawsuit, thus freeing him from the need to work for a living. But at trial, Sheridan denied knowing that Connors had any source of income other than cigar import-

ing. According to Connors, if he had been given access to Sheridan's C.I. file he would have been able to show that this was a lie. But in order to present a concern under *Brady*, the withheld information must be material to the issue at trial. *See Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). Connors argues that Sheridan's testimony may have led the jury to believe that he had no legitimate income and thus needed cash from his illegal cigar importing to get by. But Sheridan didn't testify that there was no settlement, only that he didn't know about it. Sheridan's knowledge of the settlement has no bearing on Connors's guilt or innocence, and Connors was not inhibited from presenting to the jury the fact of the settlement itself. The withholding of the confidential informant file did not prejudice the trial's outcome.

While the arguments Connors advanced so far have merit, his remaining claims are borderline frivolous. He says the evidence was insufficient to convict him of smuggling "Cuban" cigars because the government didn't perform an analysis to prove that the cigars seized from him actually came from Cuba. He argues that it is not enough that the cigars themselves were marked as having been made in Cuba. He cites *Kennedy v. United States*, 44 F.2d 131, 133 (9th Cir. 1930), for the proposition that "the court may not take judicial notice of the fact that the labels [on allegedly contraband merchandise] are what they purport to be." But there was no judicial notice here—the evidence was submitted to a jury (the cigars themselves, along with the evidence of Connors's frequent trips to Cuba), and the jury permissibly concluded that one plus one equals two and the cigars must have come from Cuba.

Connors similarly challenges his conviction for making a false statement on a passport application. After customs officials took his passport from him at the Canadian border, Connors applied for a replacement. On the application,

under the heading "Lost/Stolen Passport Information," Connors wrote: "My passport is missing since 4-7-96 while I was visiting friends in Canada and returning to the United States." He now argues that this was literally true—that "missing" means nothing more than "no longer possessed"—and therefore his statement cannot support a conviction under 18 U.S.C. §1542. Make this claim to a nonlawyer and you're liable to get a "you can't be serious" response. The jury obviously got it right: Connors's passport was retained by U.S. government authorities; it was not "missing" in any common sense understanding of the word.

Finally, Connors raises an argument based on *United States v. Booker*, 543 U.S. 220 (2005), pointing out that the district court enhanced his sentence based on several factual findings of its own making. Normally, such a situation calls for a limited remand under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), with the possibility of eventual resentencing. But Connors goes further, arguing that resentencing under the remedial holding of *Booker* would violate the Constitution's *ex post facto* clause and that we should therefore simply reduce his sentence to the maximum available under the sentencing guidelines in the absence of the prohibited enhancements, which in his case is 6 months. We rejected a similar argument in *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005), and we see no reason why we should reconsider that argument here. Therefore, with respect to Connors's sentence we order a LIMITED REMAND in accordance with *Paladino*, retaining jurisdiction over the case. In all other respects the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*