Argued and submitted March 6, decision of Court of Appeals reversed;
judgment of circuit court affirmed December 31, 2009

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# JOHN FREDERICK LUMAN,
*Respondent on Review.*

# (CC 04102244; CA A132197; SC S056470)

223 P3d 1041

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for petitioner on review. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Chris Dunfield, Petersen, Dunfield & Fahy, Corvallis, argued the cause and filed the brief for respondent on review.

GILLETTE, J.

De Muniz, C. J., dissented and filed an opinion, in which Durham and Walters, JJ., joined.

### GILLETTE, J.

The state appeals from a Court of Appeals decision reversing a trial court order that denied in part defendant's motion to suppress evidence. As in *State v. Heckathorne*, 347 Or 474, 223 P3d 1034 (2009), the issue in this case involves the warrant requirement in Article I, section 9, of the Oregon Constitution. Here, the question is whether the police were required to obtain a search warrant to view the images on a videotape in their possession when, without the owner's consent, private parties already had viewed the videotape and then given it to the police. The Court of Appeals concluded (1) that the videotape is not a transparent container that announces its contents, and (2) that the fact that private parties (who were employees of defendant) had viewed a part of the videotape before turning it over to the police and had described to the police what they had seen on the videotape did not extinguish defendant's privacy interest in the contents of the videotape. Therefore, the Court of Appeals held, the police violated defendant's privacy right under Article I, section 9, when they viewed the videotape without first securing a warrant. *State v. Luman*, 220 Or App 617, 628, 188 P3d 372 (2008). We allowed the state's petition for review and now reverse the decision of the Court of Appeals.

The relevant facts are undisputed. Defendant owned a restaurant and catering service. He kept a television in the restaurant kitchen, and he instructed the restaurant staff not to use the television. Nevertheless, the employees sometimes watched the television while they worked. On one occasion, when defendant was not in the restaurant, an employee, Smith, turned on the television to watch the news. However, when Smith did so, a videotape in an attached video-cassette recorder (VCR) began playing automatically. The videotape displayed images of women using the restaurant's only restroom. Smith alerted a female coworker, Jones, and the two watched parts of the videotape. Smith and Jones then discovered wires running from the VCR into an electrical plug in the wall of the bathroom directly across from the toilet, as well as an area where they believed a camera could have been placed. The employees also found other videotapes in the kitchen and in a bag in the restaurant's walk-in cooler. Some of the videotapes were hand-labeled with the names of

movies; two videotapes, including the videotape in the VCR, were hand-labeled "master." Later that day, after showing the videotapes to two other employees and debating what they should do with them, Jones called the sheriff's office and eventually turned the videotapes over to the sheriff's office.

Four days later, without obtaining a warrant, a deputy sheriff watched the videotapes. Most of the videotapes contained recordings of the restroom when it was not in use, or "dead time." However, interspersed throughout the "dead time" were recordings of women in a state of partial nudity as they used the restroom. The two videotapes labeled "master" contained the same images, but they had been edited to remove the "dead time." In total, the videotapes contained images of 48 different people.

Defendant was charged with 48 counts of invasion of personal privacy, in violation of ORS 163.700.[1] Before trial, defendant moved to suppress the videotapes and all evidence derived from them, on the ground that the deputy viewed the videotapes without first securing a warrant to do so and thereby engaged in an unconstitutional search in violation of defendant's privacy rights under Article I, section 9, of the Oregon Constitution and under the Fourth Amendment to the United States Constitution. The state responded that no warrant was required, because the sheriff's office lawfully had received the videotapes from the employee, who had informed the deputy of the contents of the videotapes. According to the state, defendant had no remaining privacy interest in the contents of the videotapes, because the employee's description of the contents of the videotapes "announced" that the videotapes contained evidence of a crime.

---

[1] ORS 163.700 provides, in part:

"(1) Except as provided in ORS 163.702 [pertaining to medical and law enforcement exceptions], a person commits the crime of invasion of personal privacy if:

"(a)(A) The person knowingly makes or records a photograph, motion picture, videotape or other visual recording of another person in a state of nudity without the consent of the person being recorded; and

"(B) At the time the visual recording is made or recorded the person being recorded is in a place and circumstances where the person has a reasonable expectation of personal privacy[.]"

The trial court suppressed all the videotapes but one; the court declined to suppress the "master" videotape that Smith initially viewed in the VCR at defendant's restaurant and then watched with Jones and other employees. The trial court reasoned that the videotapes that defendant's employees had not previously viewed did not "announce" that those videotapes contained evidence of a crime; the court therefore ordered that those videotapes be suppressed. However, the trial court reasoned that the contents of the "master" videotape had become "apparent" by the time the police had viewed it. Therefore, the trial court concluded that defendant had no remaining privacy interest in the "master" videotape and refused to suppress it. The "master" videotape, which contained recordings of 11 different women using the restroom, was introduced into evidence at defendant's trial. Based on that evidence, a jury found defendant guilty of 11 counts of invasion of personal privacy.

Defendant appealed, assigning error to the trial court's failure to suppress the "master" videotape. The Court of Appeals reversed, concluding that the trial court erred, under Article I, section 9, in refusing to suppress the videotape. The court rejected the state's argument that defendant no longer had a privacy interest in the contents of the "master" videotape because Smith and the other employees had viewed the videotape and had described the images on the videotape to the police. In doing so, the Court of Appeals stated that

> "the mere fact that a private third party has knowledge of the contents of something in which a defendant claims a privacy interest—even if that party conveys the information to the police—does not mean that a defendant no longer has 'the right to be free from intrusive forms of government scrutiny.' *State v. Dixson/Digby*, 307 Or 195, 208, 766 P2d 1015 (1988). Article I, section 9, does not countenance such a result."

*Id*. at 626. In this case, the Court of Appeals observed, defendant did not evince an intent to relinquish his privacy interest in the videotape; rather, a "special effort" on the part of the employees, including violating workplace rules, was required to view the images on the videotape. *Id*. at 627. Therefore, according to the court, because defendant did not,

by his own conduct, abdicate his privacy interest in the videotape, he still retained that interest, even after his employees had viewed the videotape and delivered it to the sheriff's office, and the deputy's viewing of the videotape without a warrant violated that privacy interest. *Id.* at 627-28.

As noted, this court allowed the state's petition for review. On review, the state repeats the arguments that it made to the Court of Appeals.[2]

We begin with first principles. Article I, section 9, of the Oregon Constitution, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

That provision protects individuals "against unreasonable search, or seizure," and it protects both possessory and privacy interests in effects. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). As the Court of Appeals observed, there is no real dispute that the sheriff's office's possession of the videotape was lawful. *Luman*, 220 Or App at 622. That is so because private parties, not state actors, first viewed the videotape and then, on their own initiative, brought it to the sheriff's office. It is axiomatic that Article I, section 9, applies only to government-conducted or -directed searches and seizures, not those of private parties. *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000) ("It is true that Article I, section 9, prohibits only state action that infringes on a citizen's constitutional rights.").

The foregoing principle applies even if the private parties acted unlawfully in conducting the search and seizure that ultimately led to police possession of the evidence. That is, even if defendant's employees in this case had committed theft (which they did not) when they took the videotape from defendant's restaurant and delivered it to the sheriff's office,[3]

---

[2] The state does not challenge the trial court's suppression of the videotapes that the employees had not previously viewed. Because those videotapes are not part of this case, we refer in this opinion to the singular "videotape" that is at issue.

[3] We note that defendant never has argued that the employees acted unlawfully in taking the videotape. It is true that defendant has maintained that his

that fact would not somehow turn that conduct into state action or render the sheriff's office's later possession of the videotape unlawful. This court has not stated so much expressly, but the federal courts clearly have endorsed that proposition under the Fourth Amendment to the United States Constitution, and we find that reasoning persuasive.

For example, in *Burdeau v. McDowell*, 256 US 465, 41 S Ct 574, 65 L Ed 1048 (1921), the defendant's former coworkers broke into his private office, drilled into his private safe, broke the locks on his private desk, and broke into and abstracted documents from his private files, all in order to steal books and papers that established that the defendant had committed fraud against his former employer. As the United States Supreme Court stated with respect to the defendant's subsequent Fourth Amendment challenge to the prosecution's use of that evidence against him:

"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies * * *.

"In the present case the record clearly shows that no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of [the former employer]. It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken was turned over to the prosecuting officers of the Federal Government. We assume that petitioner has an unquestionable right of redress against those who illegally and wrongfully took his

---

employees took the videotape without his permission or consent and that their delivery of the videotape to the sheriff's office was unauthorized, but it is clear from context that that argument merely was intended to refute the state's contention that defendant had relinquished his possessory and privacy interest in the videotape; it was not an assertion that the sheriff's office's possession of the videotape was unlawful.

private property under the circumstances herein disclosed, but with such remedies we are not now concerned."

256 US at 475; *see also, e.g., United States v. Snowadzki,* 723 F2d 1427 (9th Cir), *cert den,* 469 US 839 (1984) (documents showing defendant had significant unreported income, which had been provided to IRS by defendant's coworker who had stolen them from defendant's desk, admissible in defendant's subsequent trial on charges of filing false tax returns; no Fourth Amendment violation, because government not involved in theft); *United States v. Connors,* 441 F3d 527 (7th Cir 2006) (no Fourth Amendment violation requiring suppression of evidence obtained by bitter ex-wife who knew about defendant's Cuban cigar smuggling operation, cozied up to defendant to gain entry into his home, stole incriminating documents from defendant's private files, and put them in the trash for federal agents to find).

No party has suggested that the rule under the Oregon Constitution should be different; given what this court stated in *Tucker,* we assume the rule is the same. Therefore, because the deputy's receipt of the videotape (from the private citizens who had taken it) was constitutionally lawful, defendant no longer retained a protected possessory interest in the videotape or privacy interest in its exterior. The only question remaining, then, is whether defendant nonetheless retained a protected privacy interest in what that videotape showed that would be invaded by the deputy's warrantless viewing of it.

As discussed above, in holding that a warrant was required, the Court of Appeals held that the deputy conducted a "search" of the videotape when he viewed it. As this court stated in *State v. Howard/Dawson,* 342 Or 635, 640, 157 P3d 1189 (2007), a "search" occurs when an individual's protected privacy interests are invaded.[4] The court went on:

"When * * * the police act without a warrant and no exception to the warrant requirement applies, the question whether the police have violated Article I, section 9, reduces

---

[4] The court also stated that a "seizure" occurs when government agents significantly interfere with the person's possessory or ownership interest in the property. *Howard/Dawson,* 342 Or at 640.

to whether the officers' acts invaded either a constitutionally protected possessory or privacy interest."

Put differently, if the police do not invade a *protected* privacy interest by examining a piece of evidence, a "search" does not occur and no warrant is necessary.[5] In addition, as this court often has stated, the privacy protected under Article I, section 9, " 'is not the privacy that one reasonably *expects* but the privacy to which one has a *right*.' " 342 Or at 643 (quoting *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988); emphasis in *Campbell*).

As noted, the Court of Appeals held that defendant retained a privacy interest in the videotape, because nothing in his conduct evinced his intent to abdicate that privacy interest, and his employees had to undertake "special efforts," including violating workplace rules, to view the videotape. Under Article I, section 9, however, the fact that defendant did not evince an intent to relinquish his privacy interest in the videotape is irrelevant to the question whether he retained a protected privacy interest in the videotape or whether a search occurred. Even defendants whose property is lawfully seized under the authority of a warrant may not intend to relinquish their privacy interest in that property. The only relevant question is whether defendant had any *right* to privacy in the videotape once his employees had viewed it and turned it over to law enforcement.

■  We have no trouble concluding that he did not. Once private parties have seized a piece of evidence, examined it, and delivered it to a police officer (thereby giving the police

---

[5] In *Howard/Dawson*, the defendants had thrown incriminating evidence in their garbage, and a police officer made arrangements to have the sanitation company deliver the defendants' garbage to him after collecting it. The police officer looked through that garbage without obtaining a warrant and used what he found there to support a warrant to search the defendants' house. The defendants agreed that they did not retain an ownership or possessory interest in their garbage once the sanitation company had picked it up, but argued that they still retained a privacy interest in it, the invasion of which would constitute a "search." The court stated that, although the defendants may not have expected the sanitation company or anyone else to look through their garbage, their subjective expectations were irrelevant. The court held that the defendants had no protected privacy interest in the garbage once the sanitation company had picked it up. 342 Or at 643. Consequently, no "search" occurred when the officer looked through the garbage and no warrant was required.

officer lawful possession of that evidence for criminal investigatory purposes), the police officer's subsequent, confirmatory examination of that evidence involves no additional injury to any privacy interest of the property owner; any privacy interest that the property owner once may have had in that piece of evidence is destroyed, at least to the extent of the scope of the private search.

As the state has pointed out in its brief to this court, that is the rule that the federal courts employ in analogous situations under the Fourth Amendment. That rule first was adopted by a majority of the United States Supreme Court in *Walter v. United States*, 447 US 649, 100 S Ct 2395, 65 L Ed 2d 410 (1980). In *Walter*, private parties had received a box full of pornographic 8 mm films that had been misdelivered by a private carrier. The private parties had opened the box, which was plain cardboard, and had seen that the box contained a shipment of 871 individual boxes, each apparently containing a pornographic film. On one side of each box was a suggestive drawing and, on the other, an explicit description of the film. The private parties did not actually open any of the boxes or view the films before turning them over to the FBI. FBI agents then viewed the films with a projector without first obtaining a warrant. In overturning the defendant's subsequent convictions on obscenity charges, the Court held that, although the nature of the contents of those films was suggested by descriptive material on their individual containers, exhibition of the films without a warrant nevertheless constituted an unreasonable invasion of the defendant's constitutionally protected interest in privacy; the fact that private parties had opened some of the packages before the private parties gave the boxes to the FBI did not excuse the failure to obtain a search warrant. In so holding, the Court stated,

> "When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization. * * *
>
> "If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy. Even

though some circumstances—for example, if the results of the private search are in plain view when materials are turned over to the Government—may justify the Government's re-examination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search. In these cases, the private party had not actually viewed the films. Prior to the Government screening one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained."

*Walter*, 447 US at 656-57 (footnote omitted).

However, the Court later explained the limitations on the *Walter* rule in *United States v. Jacobsen*, 466 US 109, 104 S Ct 1652, 80 L Ed 2d 85 (1984). In *Jacobsen*, Federal Express employees inspected a cardboard box that had been damaged in transit. Inside the box was a tube, approximately ten inches long, made of duct tape. Two employees cut open the tube and, inside it, found four plastic bags, which they then pulled out. One of them contained several ounces of white powder. The employees then notified the Drug Enforcement Administration (DEA). Before the first DEA agent arrived, the employees replaced the plastic bags in the tube and put the tube back into the box.

When the DEA agent arrived, he looked in the box, saw the slit in the tube that the employees had made, pulled out the plastic bags, opened them, and then performed a field test on the white powder. That test confirmed that the substance was cocaine. Eventually, other agents arrived; they performed a second test, rewrapped the tube, and obtained a warrant to search the defendant's address, to which the box and tube were supposed to have been delivered. The defendant subsequently was charged with and convicted of possession of a controlled substance with intent to distribute it. In upholding the trial court's denial of the defendant's motion to suppress the evidence found in the tube, the Court stated,

"The initial invasions of respondents' package were occasioned by private action. Those invasions revealed that

the package contained only one significant item, a suspicious looking tape tube. Cutting the end of the tube and extracting its contents revealed a suspicious looking plastic bag of white powder. Whether those invasions were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character.

"The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search. * * *

"* * * * *

"This standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities. It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information[.] * * * The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant."

*Jacobsen*, 466 US at 115-18 (footnotes and citations omitted). And, the Court held, because the search conducted by the federal agent in pulling the plastic bags out of the tube and examining them was not more intrusive than the private search that had preceded it, it did not further infringe on the defendant's privacy.[6]

---

[6] The Court also held that the field test of the white powder, which had not been conducted by the Federal Express employees and therefore technically exceeded the scope of the private search, was not an unlawful "search" or "seizure" within the meaning of the Fourth Amendment. According to the Court, "[a] chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." *Jacobsen*, 466 US at 123. That also is consistent with this court's jurisprudence under Article I, section 9, of the Oregon Constitution.

■       We recognize that the foregoing analysis differs from the approach that this court would take under Article I, section 9, to the extent that the question whether a person's Fourth Amendment right to be free from unreasonable searches and seizures is violated turns on whether the person has a "reasonable expectation" of privacy, rather than a "right" to that privacy as under Article I, section 9. However, that distinction does not render the federal analysis inapposite to the situation before us. Rather, we conclude that a private search frustrates a person's *right* to privacy under Oregon's Constitution exactly to the same extent that it frustrates a person's *expectation* of privacy under the federal constitution.

■       In this case, defendant's employees seized the videotape, viewed it, handed it over to the deputy, and told him exactly what was on it. (And, as noted, none of that private conduct violated defendant's Article I, section 9, rights.) At that point, defendant no longer retained a protected possessory or privacy interest in the piece of evidence; those interests were destroyed by the private conduct. That is, defendant no longer had a *right* to privacy in the videotape. Because the deputy's act in viewing the videotape invaded neither a possessory interest nor a right to privacy in the images on the videotape that was protected by Article I, section 9, of the Oregon Constitution, that act was not a search and no warrant was required.[7]

        The foregoing is consistent with this court's decision in *State v. Munro*, 339 Or 545, 124 P3d 1221 (2005). In *Munro*, the police obtained a search warrant permitting the officers to search for and seize drug-related evidence, including, among other things, business records, photographs, and videotapes. In the ensuing search, the police seized, among other things, a videotape. When the officers initially tried to view the videotape, it appeared to be blank; nevertheless, the officers retained the videotape. Based on other evidence found in the search pursuant to the warrant, the defendant was charged with possession of a controlled substance. Sometime later, while the defendant's trial on the drug charge was

---

[7] It follows from the foregoing discussion that defendant's Fourth Amendment rights also were not violated by the deputy's viewing of the videotape.

pending, the police officers obtained information suggesting that the videotape contained images of child pornography. Without obtaining another warrant, the officers sent the videotape to a video service company, which was able to access the pornographic contents of the videotape, and the defendant was charged with encouraging child sexual abuse. Before the defendant's subsequent trial on that charge, the defendant unsuccessfully moved to suppress the images found on the videotape, arguing that the police officers' viewing of the videotape was an unconstitutional warrantless search. The defendant eventually was convicted of that charge. On defendant's appeal, the Court of Appeals reversed and remanded the case for a new trial.

On review, this court reversed the decision of the Court of Appeals. In so doing, the court accepted the state's concession that the police officers' viewing of the videotape was a search, but stated that the question before the court was whether the defendant had retained any privacy interest in the videotape (after its seizure and initial examination) that could not lawfully be invaded under the authority of the first, drug-related warrant. 339 Or at 550. The court held that he did not. The court noted that the warrant authorized the seizure of the videotape, thereby depriving the defendant of his possessory interest in the videotape. *Id.* at 552. The court then stated, "Similarly, the warrant authorized the police to invade the privacy of the videotape by examining and exhibiting its contents." *Id.* That is, the court held, once the police lawfully seized the videotape and, therefore, lawfully possessed the videotape for criminal investigatory purposes, the police were fully entitled to examine and exhibit the videotape:

> "[T]he warrant lawfully authorized the seizure of the video-tape and the invasion of defendant's privacy interest in its contents. Once the police seized the videotape under the authority of the warrant, any privacy interest that defendant had in the contents of the videotape was destroyed by the authority of the warrant permitting the examination and exhibition of the contents of the videotape. Until such time as defendant regained lawful possession of the video-tape, he had no remaining privacy interest in its contents that he could assert.

"The fact that the police did not initially observe any images on the videotape when they initially examined it is of no legal significance. Once they lawfully had seized the videotape, nothing prevented the police from examining the contents of the videotape as often as they deemed necessary. Furthermore, once the videotape was lawfully seized under the authority of the warrant, any images stored on the videotape, no matter how hidden, private, or secret, were no longer protected by Article I, section 9."

*Id.* at 552-53.

The Court of Appeals read the foregoing passages from *Munro* as supporting its contrary conclusion that, because there was no search warrant in this case destroying defendant's possessory and privacy interest in the videotape, defendant retained a privacy interest in it and a warrant therefore was required to view it. That reading was based on the Court of Appeals' understanding that the warrant in *Munro* specifically, and in so many words, authorized not only the seizure of the videotape but also the viewing of it. *Luman*, 220 Or App at 626 ("That is, the dispositive circumstance in *Munro* was that '*the warrant authorized the police to invade the privacy of the videotape*.' " (Emphasis in original.)). That understanding, however, is wrong.

The warrant in *Munro* provided, " 'You are hereby commanded to search: * * * For the following described property: * * * videotapes * * *.' " 339 Or at 548 n 4. That is all. Thus, when the *Munro* court referred to "the authority of the warrant permitting the examination and exhibition of the contents of the videotape," the court clearly was speaking of the right to play and view the videotape that *inhered* in the lawful seizure of the videotape (which was all that the warrant expressly permitted). In this case, as already discussed, the sheriff's office gained lawful possession of the videotape for criminal investigatory purposes when defendant's employee brought the videotape into the sheriff's office, told the deputy sheriff what was on the videotape and the circumstances surrounding its discovery, and handed it over. That set of circumstances is the functional equivalent of the lawful "seizure" in *Munro* under the authority of the warrant, which also gave the police lawful possession of the videotape. And, as in *Munro*, because the sheriff's office's possession of the

videotape for criminal investigatory purposes was lawful, any protected possessory or privacy interest defendant might have had in the videotape was lost, at least to the extent that the employees already had viewed it, and the deputy's subsequent confirmatory viewing of the videotape was not a constitutionally impermissible search. The contrary conclusion of the Court of Appeals was erroneous.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**DE MUNIZ, C. J.,** dissenting.

The videocassette is a constitutionally protected effect, and its contents are the images on the videotape. Those images are not in plain view and can be viewed only by the use of an electronic device. Article I, section 9, of the Oregon Constitution protects a person's right of privacy in the contents of an effect against unreasonable search and seizure. Today, however, the majority concludes that, once third parties have seized and viewed the contents of an effect before giving it to the police, the owner's privacy interest in the contents of the effect has been extinguished, thereby relieving the police of their constitutional obligation to obtain a search warrant. Because I would hold that defendant retained a privacy interest in the images on the videotape and that the police violated defendant's privacy right protected by Article I, section 9, when they viewed the images on the videotape without first securing a warrant, I respectfully dissent.

The majority, relying on Fourth Amendment[1] cases, concludes that the police did not need to obtain a search warrant before viewing the images, because that viewing revealed nothing more than, or at least did not significantly expand, the scope of the prior private "search" of the videotape by defendant's employees. Citing *United States v. Jacobsen*, 466 US 109, 115, 104 S Ct 1652, 80 L Ed 2d 85 (1984), the

---

[1] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

majority concludes that, although the federal analysis differs from the approach this court would take under Article I, section 9, that analysis is nonetheless applicable here because "a private search frustrates a person's *right* to privacy under Oregon's Constitution exactly to the same extent that it frustrates a person's *expectation* of privacy under the federal constitution." 347 Or at 499 (emphasis in original). That reasoning contradicts this court's prior Article I, section 9, case law.

Article I, section 9, of the Oregon Constitution provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Article I, section 9, protects both possessory and privacy interests in effects. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). "A privacy interest, as that phrase is used in this court's Article I, section 9, opinions, is an interest in freedom from particular forms of scrutiny." *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988). Privacy interests that are protected by Article I, section 9, "commonly are circumscribed by the space in which they exist and, more particularly, by the barriers to public entry (physical and sensory) that define that private space." *State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998). It is governmental intrusion past those barriers, engaged in wholly at the discretion of the government, that Article I, section 9, protects against through the warrant requirement. *Campbell*, 306 Or at 171. Indeed, when warrants are challenged, courts resolve doubtful or marginal cases in favor of the preference for warrants, *State v. Tacker*, 241 Or 597, 602, 407 P2d 851 (1965), in order to encourage the use of warrants by the police before they act.

That preference has its origins in the constitutional principle of separation of powers and recognizes that a search pursuant to a warrant involves both the executive branch, which conducts the search, and the judicial branch, which decides whether to issue the warrant. By contrast, a warrantless search is a unilateral act of the executive branch

unchecked by judicial oversight. Under Article I, section 9, the rule in Oregon is clear: "warrantless * * * searches * * * are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (quoting *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). Article I, section 9, requires that a police officer have probable cause *and* either a valid warrant or a justification under an exception to the warrant requirement, to conduct a lawful search. Those justifications cannot be merely a concern that it would be inconvenient to obtain a warrant or that, as the majority concludes here, so little privacy remains after a third-party search that no constitutional protection is justified.

The majority emphasizes the fact that the employees told the police "exactly what was on [the videotape.]" 347 Or at 499. The fact that defendant's employees told the police what they saw when they played the videocassette may have provided probable cause to believe, as the employees claimed, that the videotape contained images of women using the restroom. However, the employees' statements did not physically place the images in the plain view of the police such that they could observe those images without using an electronic device to reveal them, thereby conducting a search. Because the viewing of the images on the videotape was a search, the police were required to obtain a warrant or establish an exception to the warrant requirement before conducting that search.

The majority also is confused regarding the extent of the warrant issued in *State v. Munro*, 339 Or 545, 124 P3d 1221 (2005). The majority states that the warrant authorized only the seizure of the videocassette at issue in that case, but not the viewing of it, and that this court thus determined that the right to view the images on the videotape "inhered" in its lawful seizure. 347 Or at 501. That is a not a complete reading of the affidavit in support of the search warrant and the warrant that was issued in that case. The affidavit provided, in part:

" 'Persons who possess and distribute marijuana and other controlled substances *often keep records pertaining to*

*their illegal narcotic activities.* These include records of marijuana values they have packaged and sold, lists of customers and associates, and records of drug payments and debts. Such records are commonly kept at the premises where the controlled substances are processed and sold, are secured in safes, lockboxes, computers, or other secure or concealed locations secreted at the location. This facilitates easy access by the seller while affording protection from unwanted discovery.

" 'These records include written and electronically stored business documents, ledgers, address books, computer files and software, telephone toll records, notes, messages, *photographs and video films,* and encrypted memoranda indicating drug debts/sales.' "

*Munro*, 339 Or at 547-48 n 3 (first emphasis added, second emphasis in original). In turn, the warrant provided, in part:

" 'You are hereby commanded to search:

" '\* \* \* \* \*

" 'For the following described property:

" '[I]tems of identification such as utility bills, mail addressed to the occupants, rent receipts and property ownership papers, financial and personal paper; business records such as ledgers, address books, bank records, travel records, computers and their files and related software, telephone toll records; phone recorders, cellular telephones, electronic pagers, caller identification devices, notes, messages, encrypted memoranda, records of drug sales and debts, photographs and videotapes[.]' "

*Id.* at 548 n 4 (emphasis omitted). The warrant in *Munro* explicitly provided the authority to view the images on the videotape. The warrant did not, as the majority asserts, provide explicit authority to seize and only *implied* authority to search. The court explained that

"[o]nce the police seized the videotape under the authority of the warrant, any privacy interest that defendant had in the contents of the videotape was *destroyed by the authority of the warrant permitting the examination and exhibition of the contents of the videotape.* Until such time as defendant regained lawful possession of the videotape, he had no

remaining privacy interest in its contents that he could assert."

339 Or at 552 (emphasis added). The conclusion that the majority draws here—that lawful possession of an effect by the police thereby extinguishes a person's privacy rights in the *contents* of that effect—is not supported by this court's decision in *Munro*. Moreover, that conclusion contradicts other pertinent Article I, section 9, case law from this court.

For example, in *State v. Keller*, 265 Or 622, 510 P2d 568 (1973), defendant was stopped in her car and arrested. During an inventory of the contents of her car, the police noted an open cosmetic case on the floor in front of the driver's seat, and its contents, syringes and needles, were in plain view. They also observed a fishing tackle box, on the floor of the back seat, held closed by a "red wire tied around it." *Id.* at 624. The police removed the wire and opened the tackle box to inventory its contents and observed five vials of liquid, litmus paper, and razor blades. The liquid later was determined to be a controlled substance, which was the basis of the indictment against defendant. The arresting officer testified that when the box was opened there was the odor of methamphetamine, which he had smelled before in a "narcotics lab." *Id.* This court affirmed the trial court's ruling that the evidence should be suppressed, stating that

> "[w]ith no exigent circumstances present [the police] could have easily inventoried 'one fishing tackle box,' along with other items in plain view. If they had probable cause to believe a crime was being committed, after seeing the syringes and needles in the open cosmetic case, they could have sought a search warrant from a disinterested magistrate."

*Id.* at 625-26.

Here, as in *Keller*, the fact that the police had possession of the videocassette did not automatically result in defendant's loss of his privacy interest in the images on the videotape such that the warrant requirement could be dispensed with.

As noted above, this court has concluded numerous times that warrantless searches, unless falling within a few, well-defined exceptions, are *per se* unreasonable. *Davis*, 295 Or at 237; *see also State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987) ("As this court repeatedly has stated, if an instruction

is a 'search' or a 'seizure,' it requires 'probable cause and a search warrant or separate justification under one of the few, carefully circumscribed exceptions to the warrant requirement' of Article I, section 9, of the Oregon Constitution."). Here, defendant had manifested his intent to keep the images on the videotape private by instructing his employees that they were forbidden from watching the television. Moreover, defendant's loss of possession was not because he had somehow abandoned the videocassette. Instead, the videocassette was taken from his possession without his permission. Defendant's conduct demonstrated his intent to exercise his privacy interest in the videotape, even if, after its theft by his employees, he lost his possessory interest in the videocassette. *See State v. Cook*, 332 Or 601, 607-08, 34 P3d 156 (2001) ("[B]ecause Article I, section 9, protects both possessory and privacy interests in effects, property law concepts of ownership and possession are relevant, though not always conclusive, in the factual and legal determination whether a defendant relinquished all constitutionally protected interests in an article of property."). The majority maintains that, by taking the videocassette out of defendant's restaurant without permission, the employees did not commit "theft." Given that defendant does not challenge the subsequent seizure of the videotape or the possession of it by the police, it is unclear why the majority feels this is a significant point, and in my view it is a distinction without a difference. It is undisputed that the employees did not have permission to use the television in the kitchen and did not have permission to remove the videocassette from the premises. That is enough to demonstrate defendant's intent to keep the images on the videotape private.

Knowing that the videocassette was given to them by defendant's employees, and not by defendant himself, the officers could not have reasonably concluded that defendant intended to relinquish his privacy interests in the images on the videotape, nor should this court. *See id.* at 608 (question to be resolved in such cases is whether a defendant's statements and conduct demonstrated that he relinquished all constitutionally protected interests in articles of property, so that both warrantless seizure of property and resultant search by police were reasonable under Article I, section 9).

Because the images on the videotape were not visible, defendant retained a privacy interest in the images on the videotape even though he had lost his possessory interest when Jones gave the videocassette to the police. In the absence of some exception to the warrant requirement or an exigency that would require the police to proceed quickly to preserve evidence, the police were required to secure a warrant to view the images on the videotape. In my view, the warrant requirement under Article I, section 9, is not a mere formality that can be so casually cast aside, as the majority does here.

In light of the foregoing, I would conclude that the officers conducted a warrantless search when they viewed the images on the "master" videotape, to which no exception to the warrant requirement applied. Thus, I would hold that the trial court erred in declining to suppress the images on that videotape. I respectfully dissent.

Durham and Walters, JJ., join in this opinion.