Argued and submitted March 5, decision of Court of Appeals reversed; judgments of circuit court affirmed December 31, 2009

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## GEORGE ALLEN HECKATHORNE,
*Respondent on Review.*

(CC 050014CR; CA A128670 (Control))

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## CYRUS DALE HECKATHORNE,
*Respondent on Review.*

(CC 050015CR; CA A128671; SC S056073)
(Cases Consolidated)

223 P3d 1034

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the

briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Erin K. Galli, Chilton, Ebbett & Galli, LLC, Portland, argued the cause and filed the brief for respondents on review.

Mary Reese, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for *amicus curiae* Oregon Public Defense Services in support of respondents on review. With her on the brief was Peter Gartlan, Chief Defender.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

The state seeks review of a Court of Appeals decision that reversed a trial court order denying defendants' motion to suppress evidence. As in *State v. Luman*, 347 Or 487, 223 P3d 1041 (2009), the issue in this case involves the intersection between the warrant requirement in Article I, section 9, of the Oregon Constitution, set out *post*, 347 Or at 482, and the scope of police authority respecting items that are lawfully in police possession. Here, the question more specifically is whether the police must obtain a search warrant to determine the contents of an opaque metal cylinder lawfully in their possession when both the exterior of the cylinder and the odor of the substance emitted from the cylinder indicates that it contains ammonia.

Defendants were charged with and convicted of possession of a precursor substance—anhydrous ammonia, a chemical used in methamphetamine production—with intent to manufacture a controlled substance, ORS 475.967. The ammonia was contained in a metal cylinder that the police found in defendants' vehicle. The trial court denied defendants' motion to suppress, finding that the cylinder was discovered as part of a valid inventory and that the distinct blue discoloration on the cylinder indicated that the cylinder contained the unlawful substance. Following their convictions, based on pleas of no contest, defendants appealed. *See* ORS 135.335(3) (allowing appeals in such circumstances). The Court of Appeals reversed, holding that the police were required to obtain a warrant to determine the contents of the cylinder, because the cylinder did not "announce its contents," and defendants therefore retained a privacy interest in the contents of the cylinder. *State v. Heckathorne*, 218 Or App 283, 291, 179 P3d 693 (2008). For the reasons that follow, we reverse the decision of the Court of Appeals and affirm the judgments of the trial court.

We take the following facts from the trial court record and the Court of Appeals opinion. In February 2005, Gilliam County Undersheriff Bettencourt was dispatched to investigate a suspicious vehicle reported in a remote area of Gilliam County. There, he discovered a vehicle parked approximately 200 feet from a group of anhydrous ammonia

tanks on private farm property.[1] As Bettencourt approached, the car began to move away. Defendant George Heckathorne (George) was driving the car. Defendant Cyrus Heckathorne (Cyrus) and another man, Holbird, were passengers in the car.

Based on his knowledge that the car did not belong to the owners of the farm and his belief that the occupants were criminally trespassing, Bettencourt instructed George to stop and step out of the car. Bettencourt conducted a background check that revealed an outstanding felony warrant for George's arrest. As a result, Bettencourt handcuffed George, placed him in the back of the patrol car, and called for further police assistance. Two other officers arrived shortly thereafter. After securing Cyrus and Holbird, Bettencourt informed the suspects that they were under arrest for criminal trespass and advised them of their *Miranda* rights. He also asked George for consent to search the car, which George refused.

After deciding that they needed to have the car towed, the officers inventoried it pursuant to a Gilliam County Sheriff's Office policy. During the inventory, the officers discovered a syringe, tools, pipe fittings exhibiting a blue discoloration, a metal gas cylinder exhibiting the same blue discoloration around its valve, and a five-gallon propane tank with missing valves. Bettencourt testified that, based on his "[t]raining and experience," he knew that "[b]rass and galvanized fittings will turn a turquoise or a fluorescent blue * * * color when [in] contact[ with] anhydrous ammonia." The officers also discovered a pipe wrench, wire cutters, screwdrivers, and rock salt, all of which, like anhydrous ammonia, are used in the production of methamphetamine. Bettencourt noticed the smell of ammonia and testified that the car "smelled like a meth lab to me." Bettencourt, however, did not attempt to determine whether the odor of ammonia came from the metal gas cylinder or elsewhere.

---

[1] Anhydrous ammonia is formed by the chemical combination of nitrogen and hydrogen in the molar proportion of one part nitrogen to three parts hydrogen, *see* ORS 561.750(1) (defining anhydrous ammonia), and is commonly used as an agricultural fertilizer.

After completing the inventory, Bettencourt transferred the inventoried items to the local state police office. Deputy Studebaker then "took possession of the [cylinder] and vented it properly."[2] According to Bettencourt, Studebaker reported that he got "a strong odor of ammonia" after he "shot" it.[3] Studebaker then used a device, which Bettencourt described as a "dragger," to test the contents of the cylinder.[4] The test was positive for anhydrous ammonia, registering 70 parts per million, the highest possible measurable amount.

Defendants subsequently were charged with possession of a precursor substance with intent to manufacture a controlled substance. Each defendant filed a motion to suppress evidence of the cylinder and its contents, arguing that the cylinder was unlawfully seized and searched under Article I, section 9, of the Oregon Constitution,[5] and the Fourth Amendment to the United States Constitution,[6] because (1) the officers had failed to secure a warrant to search the car; and (2) the subsequent "search" of the cylinder with the Dräger device was not justified under any exception to the warrant requirement.

The trial court denied defendants' motion, ruling that the cylinder and tank had been discovered as part of a valid inventory and that the officers had not needed a search warrant to test the cylinder's contents, because its distinct blue discoloration indicated that it was an instrumentality of

---

[2] Anhydrous ammonia is stored as a liquid under pressure. However, it becomes a toxic gas when released into the environment. Pure anhydrous ammonia vapors can become an explosion hazard when in a confined space.

[3] We understand from the sequence described by Bettencourt that when Bettencourt used the terms "vented it" and "shot it" he was describing one act—releasing some of the contents from the cylinder and that was when Studebaker smelled the strong odor of ammonia.

[4] Bettencourt did not explain how the device worked. From the record we surmise that Bettencourt was referring to a Dräger gas detection device, which is an electronic device that detects and tests combustible gases and vapors.

[5] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

[6] The Fourth Amendment to the United States Constitution provides, in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

a crime. Each defendant subsequently entered conditional pleas of no contest to one count of possessing a precursor substance with intent to manufacture a controlled substance, ORS 475.967, and one count of criminal trespass in the second degree, ORS 164.245.[7] Both defendants reserved the right to appeal the court's ruling on their motion to suppress. The remaining charges were dismissed.

Defendants appealed the trial court's denial of their motion to suppress, arguing that the officers needed a warrant to test the cylinder's contents, because the search was not justified by any exception to the warrant requirement.[8] In response, the state argued that the subsequent testing of the container's contents did not constitute a search for constitutional purposes, because Bettencourt first had observed the cylinder in "plain view" from "a lawful vantage point." According to the state, the cylinder's blue discoloration—combined with the cylinder's proximity to other items used to manufacture controlled substances—announced the cylinder's contents as an unlawful substance justifying the test of the contents without a warrant.

The Court of Appeals disagreed and reversed the trial court's judgment. In doing so, the Court of Appeals concluded that the test for whether a container "announces its contents" depends solely on the container itself and not on the training of the observer or the context in which the container is found. The Court of Appeals concluded that, because the cylinder did not indicate "to the world" that the cylinder contained anhydrous ammonia, the container did not, as a matter of law, "announce its contents":

> "Although some chemists, some trained police officers, and some farmers might perceive the blue coloration on a metal cylinder as the functional equivalent of a label declaring 'Contents: Anhydrous Ammonia,' those persons comprise only an extremely small segment of the citizenry.

---

[7] Defendants made no argument on appeal regarding their convictions for criminal trespass. Thus, we affirm the trial court judgments as to those counts.

[8] We note that the only issue on review is whether the police unreasonably *searched* the metal cylinder. Although defendants contested the *seizure* of the cylinder in the trial court, defendants did not advance that argument in the Court of Appeals and do not in this court. We therefore assume that the police lawfully seized the metal cylinder.

Had the cylinder been so labeled, Bettencourt could have relied on his training and experience in determining whether the contents announced were contraband. However, because those contents were not announced 'to the world,' and thus were not in plain view, opening the cylinder was an invasion of a protected privacy interest, and Bettencourt was required to secure a warrant before performing any confirmatory testing."

*Heckathorne*, 218 Or App at 291.

On review, the state again argues that the cylinder "announced its contents" to the officer—and thereby extinguished defendants' privacy right in the cylinder's contents under Article I, section 9—because the blue discoloration on the cylinder announced "unequivocally" to the officer that the cylinder contained anhydrous ammonia. According to the state, a court should consider an officer's training and experience in determining whether a defendant retains privacy rights in a container, because the focus of Article I, section 9, "necessarily must be on the individual observer, not on what the lay public as a whole might recognize." The state contends that, even if a container announces its contents to only one person with training and experience, the possessor has relinquished his or her privacy rights *vis-à-vis* that observer. That trained observation, the state contends, does not amount to a search for constitutional purposes.[9]

The state bases its argument on two cases that this court decided on the same day, *State v. Owens*, 302 Or 196, 729 P2d 524 (1986), and *State v. Herbert*, 302 Or 237, 729 P2d 547 (1986). The state argues that, although this court concluded in *Owens* that no privacy interest inhered in the contents of the defendant's transparent container, the court also left open the possibility that an opaque container could announce its contents in a similar fashion. The state further argues that *Herbert* extended the rule in *Owens* to allow the court to consider police training and experience, as well as

---

[9] Because the cylinder announced its contents and thereby extinguished defendants' privacy right in those contents, the state argues, testing the cylinder's contents did not constitute a search under Article I, section 9, of the Oregon Constitution.

context, in considering whether an opaque container announces its contents. We turn to those arguments.

■ Article I, section 9, of the Oregon Constitution provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Article I, section 9, protects both possessory and privacy interests in effects. *Owens*, 302 Or at 206. Under Article I, section 9, "warrantless * * * searches * * * are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (*quoting Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). To conduct a lawful search, Article I, section 9, requires that the police have probable cause *and* either a judicially authorized warrant or a justification under an exception to the warrant requirement. Privacy interests that are protected by Article I, section 9, "commonly are circumscribed by the space in which they exist and, more particularly, by the barriers to public entry (physical and sensory) that define that private space." *State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998).

■ In *Owens*, the police, while conducting a search incident to arrest, validly seized a clear vial found in the defendant's purse. *Id.* at 199. The police could see that the vial contained white powder, which they believed to be a controlled substance. The police had the powder tested, without a warrant, to confirm that it was indeed a controlled substance. This court reasoned:

> "When the police lawfully seize a container, they can thoroughly examine the container's exterior without violating any privacy interest of the owner or the person from whom the container was seized. For example, the police can observe, feel, smell, shake and weigh it. Furthermore, not all containers found by the police during a search merit the same protection under Article I, section 9. Some containers,

those that *by their very nature* announce their contents (such as by touch or smell) do not support a cognizable privacy interest under Article I, section 9. Transparent containers (such as clear plastic baggies or pill bottles) announce their contents. *The contents of transparent containers are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container.* Applying the doctrine of 'plain view' to transparent containers, we hold that no cognizable privacy interest inheres in their contents, and thus that transparent containers can be opened and their contents seized. No warrant is required for the opening and seizure of the contents of transparent containers or containers that otherwise announce their contents. Under the Oregon Constitution, a lawful seizure of a transparent container is a lawful seizure of its contents."

*Owens*, 302 Or at 206 (emphases added). The court went on to state that, where the police have probable cause to believe that a transparent container contains a controlled substance, the extraction of the substance to perform a confirmatory test does not infringe any privacy interest protected by the Oregon Constitution. *Id.* at 206-07. The court further acknowledged the possibility that, as with a transparent container, the contents of some opaque containers could also be known to the same extent as if they had been observed in plain view. In summary, *Owens* holds that, because the contents of a transparent container are in plain view, no privacy interest exists in the contents of the container and the police may look at, remove, and even test the contents of the container. In other words, the police may do so because the contents are just as apparent as if there were no container.

In *Herbert*, 302 Or 237, this court upheld a warrantless search of an opaque paperfold found on a defendant who had been arrested for failure to appear. The defendant asked if he could get some identification out of his truck, but instead took the paperfold out of his overalls and attempted to hide it in the truck, while attempting to distract the officer. The officer, however, observed all of the defendant's actions and, reaching through the open truck door, picked up the paperfold and asked the defendant, "What is this?" Although the officer showed the paperfold to defendant, defendant refused to respond. The officer subsequently took the paperfold and—

without a warrant—opened it at the police station, discovering white powder, which later tested positive for cocaine.

This court held that the nature of the paperfold, the circumstances of its discovery, and the officer's training and experience gave the officer probable cause to believe that the paperfold contained a controlled substance.

> "Some containers of illicit drugs may be so uniquely associated with the storage and transportation of controlled substances that their unique packaging alone might provide, to an officer with training and experience in the area of drug detection, probable cause to believe they contain a controlled substance. Examples of such unique containers might be balloons or tinfoil bundles. * * * In addition to the shape of the container, other facts gave the officer probable cause to believe that the paperfold contained a controlled substance. * * * When these additional facts are considered together with the paperfold, there were sufficient facts to give the officer probable cause to believe that the paperfold contained contraband."

302 Or at 242. Because the officer had probable cause to believe that the paperfold contained contraband, the officer could lawfully seize it. *Id.* The *Herbert* court then went on to summarily hold that, because the officer had probable cause to believe the paperfold contained contraband, "he had the right to *search* the paperfold for controlled substance[s] and, therefore, had the right to open [the] container." *Id.* at 243 (emphasis added). The court did not state nor describe the exception to the warrant requirement that would justify such a search; however, it is evident that the search was justified as a search incident to arrest or, given the defendant's furtive movements, as an exigency to avoid the destruction of evidence.[10]

■ ■ The foregoing description of *Owens* and *Herbert* establishes two important principles: (1) the contents of a container may be revealed,[11] not only visually, but also by the

---

[10] The state has not argued in this case that the officers' actions in testing the contents of the cylinder were permissible as a search incident to arrest.

[11] We use the terms "may be revealed," as opposed to "may announce its contents," because we believe that the latter phrase, while felicitous in some respects, slightly skews the appropriate inquiry by adding an anthropomorphic element. It is not the container—an inanimate object—that "announces" its contents. Rather,

container's feel or smell, and, possibly, by its taste or sound; and (2) individual expertise and training may provide the knowledge that turns various sensory clues into probable cause. The Court of Appeals' contrary view on the latter point was error.

■ The same must be said with respect to that court's ruling on the merits. The Court of Appeals concentrated its attention on the meaning of the blue discoloration on the fittings of the cylinder: Did that discoloration, or did it not, fairly give rise to the inference that the cylinder contained anhydrous ammonia? In our view, that issue can be argued either way, and it has been. We express no opinion on it, however, because the record in this case contained other, decisive evidence.

As noted above, the police opened and vented some of the contents of the cylinder. Defendants do not in this court challenge either the police possession of the cylinder or Studebaker's venting of the cylinder—they challenge only the later testing of the cylinder to confirm the contents. However, according to Bettencourt, Studebaker reported a strong odor of ammonia when he vented the container. In other words, when the cylinder was vented, the contents of the cylinder, that is, the ammonia, became discernable to Studebaker. And, because the ammonia was exposed and discernable (through the sense of smell), defendants no longer had a privacy interest in the contents of the cylinder. Thus, as in *Owens*, the use of the Dräger device to perform a confirmatory test on the contents of the cylinder did not infringe any privacy interest protected by the Oregon Constitution. Therefore, the trial court did not err in denying defendants' motion to suppress evidence of the contents of the cylinder. The Court of Appeals erred in ruling to the contrary.

■ For the same reasons, once the ammonia was plainly discernable, Studebaker's testing of the contents of the cylinder did not violate defendants' Fourth Amendment rights. *See United States v. Jacobsen*, 466 US 109, 123-25, 104 S Ct

---

it is the person who observes the container who *perceives* the likely contents of the container by virtue of sensory clues. We encourage future litigants to concentrate on sensory clues, without suggesting that the container somehow intended to present them.

1652, 80 L Ed 2d 85 (1984) (field test of substance for the presence of cocaine was not unlawful search or seizure because test could reveal only whether substance was cocaine and thus could not compromise any legitimate privacy interest).

The decision of the Court of Appeals is reversed. The judgments of the circuit court are affirmed.